UNITED STATES of America ex rel. Nicholas PARTHENIADES, Catherine Partheniades and Constantinos Partheniades, Relators,

v.

Edward J. SHAUGHNESSY, District Director of Immigration and Naturalization for the District of New York, and/or Whomsoever May Have Custody of the Bodies of Nicholas Partheniades, Catherine Partheniades and Constantinos Partheniades, Respondent.

United States District Court
S. D. New York.

Dec. 5, 1956.

Bennet, House & Couts, New York City, William S. Bennet, New York City, of counsel, for relators.

Paul W. Williams, U. S. Atty., for Southern District of New York, New York City, Charles J. Hartenstine, Jr., Special Asst. U. S. Atty., New York City, of counsel, for respondent.

IRVING R. KAUFMAN, District Judge.

This matter, brought up by the issuance of a writ of habeas corpus, presents the question of whether the denial to relators of suspension of deportation by the Attorney General acting through his subordinates constitutes an abuse of his discretion.

The undisputed facts show that the relators, husband, wife and minor son, are citizens of Greece. They have resided continuously in the United States since their admission at New York on September 23, 1947, as transients until October 28, 1947. A daughter was born to Mr. and Mrs. Partheniades in this country on May 19, 1949. It follows she is an American citizen by birth. The deportation proceedings are not directed against her. There is no dispute about the moral character of the relators, it is concededly of the highest caliber. It is undisputed that Mr. Partheniades is one of the outstanding heroes of World War II. While the Germans were in occupation in Greece, Mr. Partheniades was the leader of an underground force of allies. He was subsequently apprehended by the German Security force, tried as a

spy for the allies, convicted and sentenced to be executed. The Germans offered to commute his sentence if he would reveal the names of the others in his command, which he refused. He was subjected to other forms of torture. The British subsequently rescued him at a later date. Mr. Partheniades was awarded the highest British decoration, the Victoria Cross, for his heroic efforts during the Greek campaign in World War II. Since his arrival in this country, he has held responsible positions in the hotel and restaurant industries and has volunteered his services to the Auxiliary Police Department of New York and to religious societies.

Following deportation proceedings in 1951, the fairness of which is not challenged, relators were found deportable pursuant to section 14 of the Immigration Act of 1924. No application for discretionary relief was made at that time, and relators were ordered deported. Thereafter, they moved to reopen the proceedings for the purpose of applying for suspension of deportation as provided in section 19(c) of the amended Immigration Act of 1917. The motion to reopen was granted and a hearing was held. At the conclusion of the hearing, the Special Inquiry Officer found that the two adult aliens had established eligibility for suspension of their deportation by reason of the serious economic detriment which would accrue to their minor U. S. citizen child if they were deported. Since the minor son was ineligible for suspension of deportation because he had not been in this country for seven years, however, the Inquiry Officer concluded that in order to prevent the separation of the family, the parents remaining here, with the citizen child and the son being sent back to Greece, suspension should not be granted to any of the relators.

An appeal was taken to the Board of Immigration Appeals, based on the contention that the minor son should be eligible for suspension if his parents were found eligible. The Board did not meet this contention, however, but affirmed the Inquiry Officer's decision on March 4, 1954, on the following basis:

"* * * Since suspension of deportation is inherently a discretionary privilege, we are not disposed to grant that relief in the absence of outstanding equities. We do not consider the *mere* birth of a child on American soil to parents who have overstayed their leave as transits as sufficiently compelling *to warrant the exercise of such discretion.* Although the male respondent's war time service is an element to be considered, we do not view it as being such an outstanding equity *in and of itself* as to justify the grant of suspension of deportation." (Emphasis added.)

■ The Board made no reference to the serious economic detriment to the American citizen infant child which would result from the deportation of the parents although the hearing officer had made such a finding and the applicable statute required no more than that to warrant exercise of the Attorney General's discretion.[1] The fact that the alien has satisfied the statutory eligibility requirements does not, of course, entitle him to an automatic suspension of deportation. It does entitle him, however,

---

1. The applicable statute was section 19 (c) of the Immigration Act of 1917, which was amended on July 1, 1948, to read as follows:

"In the case of any alien * * * who is deportable under any law of the United States and who has proved good moral character for the preceding five years, the Attorney General may (1) permit such alien to depart the United States to any country of his choice at his own expense, in lieu of deportation; or (2) suspend deportation of such alien * * * if he finds (a) that such deportation would result in *serious economic detriment to a citizen* or legally resident alien who is the spouse, parent, *or minor child* of such deportable alien; or (b) that such alien has resided continuously in the United States for seven years or more and is residing in the United States upon the effective date of this Act." (Emphasis added.) 62 Stat. 1206 (1948).

to a non-capricious and non-arbitrary exercise of discretion on the part of the Attorney General or his subordinates.

Under federal regulation [2] having the force and effect of law,[3] a decision of the special inquiry officer on a request for suspension of deportation must contain "the reasons for granting or denying such application." The Supreme Court has now stated that this requirement may be complied with "by a statement to the effect that the application has been denied on the basis of confidential information, the disclosure of which would be prejudicial to the public interest, safety or security." [4] In the absence of such a statement, however, there must be some reason given for denial which would indicate that discretion was exercised. Since suspension of deportation is a matter of grace, the courts will not review its denial "unless the ground stated is on its face insufficient." [5] The two grounds stated by the Board in the instant case, i. e. that the good war record *by itself* isn't enough; and that the mere birth of a child is not so outstanding an equity as to warrant the exercise of discretion—are insufficient on their face.

In addition to Mr. Partheniades' war record, the relators urged, inter alia, that the financial burden of having to go abroad would be substantial; that due to the heavy oversubscription of the foreign quota it would be extremely difficult for them to obtain a permanent immigration visa in any reasonable length of time; that their daughter, an American citizen, would not be able to receive the education in Greece which is available to her here; that the daughter, the rest of the family and other dependents supported by Mr. Partheniades will sustain a serious economic loss if he must return to Greece because of the limited employment opportunities available there in his field, etc. The complete omission of any consideration of these factors by the Board, factors which it has considered in other cases,[6] compels the conclusion that its decision was arbitrarily reached.[7]

Furthermore, if the statement in the Board opinion that the mere birth of a child on American soil is not "sufficiently compelling to warrant the exercise of such discretion * * *" indicates that the Board did not feel itself compelled to even exercise discretion in this case, it was operating under a misconception of the law. Although the Immigration and Nationality Act of 1952 had been enacted at the time of the Board's decision, the standards for eligibility for suspension of deportation contained in section 244(a) (1) of that Act were not applicable to this case. Under the savings clause of the 1952 Act,[8] nothing contained in that act affects any proceedings brought at the time the act took effect. Since the deportation proceeding was brought before the act, the law applicable to suspension of deportation is

---

2. 8 C.F.R., Rev.1952, § 242.61(a).

3. 8 U.S.C.A. § 1103(a).

4. Jay v. Boyd, 1956, 351 U.S. 345, 360, 76 S.Ct. 919, 928.

5. United States ex rel. Kaloudis v. Shaughnessy, 2 Cir., 1950, 180 F.2d 489, 490.

6. See e. g. In the Matter of U., A–6330926, Int.Dec. No. 492 (B.I.A. 8/13/53); In the Matter of Z., A–2074510, Int.Dec. No. 494 (B.I.A. 8/13/53).

7. This situation is different from the ordinary case in which the court inquires into the sufficiency of the reason for denial given by the Board. In most cases an affirmative reason for denial is stated—i. e. disloyalty, bad moral character, etc. Here, however, no such affirmative reason is given. There is only a statement that two of the many reasons urged by the relators in support of their applications, when considered separately, are insufficient to warrant granting the requested relief. If the Board will take every factor cited by an applicant and consider whether, by itself, it is sufficient to compel suspension, applications will never be granted. Surely, this was not the result intended by Congress.

8. Immigration and Nationality Act of 1954, § 405, 8 U.S.C.A. § 1101 note.

the 1917 Act as amended.[9] Under that Act the applicant for suspension need only show "serious economic detriment" to a minor child who is an American citizen. Under the 1952 Act, however, the applicant would have to show that the deportation would "result in exceptional and extremely unusual hardship to the alien or to his spouse, parent or child," 8 U.S.C.A. § 1254(a) (1). This standard was designed to make the remedy available " * * * only in the very limited category of cases in which the deportation of the alien would be unconscionable. Hardship or even unusual hardship to the alien, or to his spouse, parent, or child is not sufficient * * * ."[10] Although the Second Circuit has established, by a divided court, that in exercising their discretion in a case governed by prior law the Board may properly consider Congressional policy in *enacting* the 1952 Act,[11] they cannot use the *standard* of that Act in determining whether the applicants are eligible for the exercise of discretion when they have satisfied the eligibility requirement of the statute governing their case. (1917 Act as amended.) Nor should the Board even feel itself bound by the Congressional policies of the 1952 Act in determining how they will exercise their discretion. If the Board approached the case with the idea that the standard of the 1952 Act was the appropriate one, and their language indicates that they may have, then there was a failure to exercise the discretion called for by the Act of 1917 and the relators are being improperly detained.

Still another possibility is that the Board really meant to affirm the conclusion of the Special Inquiry Officer on the ground on which he chose to base his discretionary denial of suspension—separation of the family—and that the statements discussed above were mere excess verbiage.[12] If this was the case, the belief that the non-citizen child was ineligible for suspension of deportation at the time was at least a factor, if not the sole factor, in the Board's determination.

On August 1, 1956, after the non-citizen child had been in this country for over seven years and had become eligible for suspension under section 19(c) (2) (b) of the Act of 1917, as amended, 62 Stat. 1206 (1948), the aliens moved to reopen the proceedings urging that they were now all eligible for suspension of deportation and that the reason for the Inquiry Officer's denial was no longer applicable. On August 21, 1956, while conceding that all the respondents now had the necessary physical presence in the United States to meet the requirements of the statute, the Board denied the motion to reopen the hearings. On October 17, 1956, the Board denied a second request to reconsider its earlier decisions and reopen the proceedings.

While the decision to reopen a suspension of deportation proceeding is within the orbit of administrative discretion,[13] it cannot be exercised arbitrarily. By their motions for reopening the relators sought an opportunity to apply for suspension under section 244(a) (1) of the 1952 Immigration and Nation-

9. See United States ex rel. Hintopoulos v. Shaughnessy, 2 Cir., 1956, 233 F.2d 705; United States ex rel. Zacharias v. Shaughnessy, 2 Cir., 1953, 221 F.2d 578.

10. Senate Report No. 1137, 82d Cong., 2d Sess. 25 (1952).

11. United States ex rel. Hintopoulos v. Shaughnessy, 2 Cir., 1956, 233 F.2d 705.

12. In discussing its granting of the privilege of voluntary departure, the Board explicitly recognized the policy basis for the hearing officer's decision. "We feel that the maximum relief warranted in the case, consistent with the facts and circumstances *and an attempt to preserve the family unit* is the privilege of voluntary departure which we will grant to all of the respondents." (Emphasis added.)

13. See Arakas v. Zimmerman, 3 Cir., 1952, 200 F.2d 322; cf. United States ex rel. Adel v. Shaughnessy, 2 Cir., 1950, 183 F.2d 371; United States ex rel. James v. Shaughnessy, 2 Cir., 1953, 202 F.2d 519, certiorari denied 1953, 345 U.S. 969, 73 S.Ct. 1112, 97 L.Ed. 1387.

ality Act. While the Board may have been able to deny their motions on the ground that relators did not come within the provisions of that Act but were still governed by the previous act, it did not suggest this.[14] Instead it based its denials on certain considerations which present serious questions as to whether they were influenced by erroneous and extraneous facts.[15] Firstly, the Board's opinion stated that "The record indicates that an order was entered granting suspension of the respondents' deportation under the Immigration Act of 1917, as amended. However, Congress failed to pass a concurrent resolution stating in substance that it favored the suspension of deportation." A careful check of the record indicates that there never was any order granting suspension of the respondents' deportation and that Congress was never called upon to pass a concurrent resolution favoring such suspension. The Special Assistant United States Attorney acting as counsel for the respondent District Director of Immigration confirmed my finding that the Board was in error as to these facts. Surely, it is not necessary for the Court to show its erudition by a lengthy discussion of the quantum of due process to which aliens are entitled, for one thing is certain—they are entitled to the exercise of administrative discretion based on the facts of their own case.

█ The second factor upon which the Board based its denials of the motions to reopen, is that "Private bills for their relief introduced into the Congress on several occasions have failed of enactment." While it is impossible to know just how much weight was given to this factor, if it was given any weight at all it would be improper. There are so many extraneous considerations involved in getting a private bill out of committee and before Congress, considerations which have nothing to do with the merits of the alien's case, that its use as a factor influencing the exercise of discretion would be highly prejudicial and completely unwarranted. The alien seeking suspension of deportation has many difficulties facing him and he should not in addition be held responsible for the delays of government which are well recognized.[16]

█ I conclude that the denials of the motions to reopen the proceedings were based on improper considerations and, therefore, the Board must reconsider those motions or similar motions based on the 1917 Act, as amended. In doing so, it will not be sufficient for the Board to merely omit these improper considerations from its findings and base denial on its previous decision of March 1954, since I have concluded that either there was a failure to exercise proper discretion at that time or if it was exercised properly the decision was based on a factor which is no longer present in the case, i. e. the ineligibility of the minor son.

Writ granted. Settle order.

14. This lends further credence to the view that the Board itself believed the 1952 Act to be applicable even as to their decision of March 4, 1954.

15. In United States ex rel. Hintopoulos v. Shaughnessy, supra, the Court considered whether a certain consideration improperly influenced the Board when it denied a similar motion to reopen the proceedings. In that case it concluded, by a divided court, that the consideration was not improper.

16. See Jackson, J., concurring in Duckworth v. State of Arkansas, 1941, 314 U.S. 390, 400, 62 S.Ct. 311, 316, 86 L.Ed. 294. "The sluggishness of government, the multitude of matters that clamor for attention, and the relative ease with which men are persuaded to postpone troublesome decisions, all make inertia one of the most decisive powers in determining the course of our affairs and frequently gives to the established order of things a longevity and vitality much beyond its merits."