265 F.2d 504
 UNITED STATES of America ex rel. George EXARCHOU, Relator-Appellant,
v.
John L. MURFF, District Director of Immigration and Naturalization at the Port of New York, Respondent-Appellee.
 No. 182.
 Docket 25361.
 United States Court of Appeals Second Circuit.
 Argued February 5, 1959.
 Decided April 15, 1959.
 
 Jay Nicholas Long, New York City, for relator-appellant.
 Roy Babitt, Sp. Asst. U. S. Atty., S.D.N.Y., New York City (Arthur H. Christy, U. S. Atty., New York City, on the brief), for respondent-appellee.
 Before CLARK, Chief Judge, MADDEN, Judge, United States Court of Claims,* and HINCKS, Circuit Judge.
 CLARK, Chief Judge.
 
 
 1
 This is an appeal from a decision of the district court dismissing a writ of habeas corpus suspending relator's deportation. Relator concedes that he illegally entered the United States in 1945 without an immigration visa and hence is deportable. In this proceeding he seeks to establish his eligibility for a discretionary grant of voluntary departure, which will allow him to re-enter this country lawfully at a later date. Inasmuch as he first petitioned the Immigration and Naturalization Service for this relief in 1949, his rights under the then in force § 19(c) of the Immigration Act of 1917 as amended, former 8 U.S.C. § 155(c), are preserved by the savings clause in § 405 of the 1952 Act, 8 U.S.C. § 1101 note. U. S. ex rel. Zacharias v. Shaughnessy, 2 Cir., 221 F.2d 578; U. S. ex rel. Partheniades v. Shaughnessy, D. C.S.D.N.Y., 146 F.Supp. 772.
 
 
 2
 On two occasions the Immigration and Naturalization Service has found Exarchou qualified for the relief he now seeks. In March 1951, following the initial determination of his deportability, it recommended that his deportation be suspended. And again in 1953, after Congress had failed to pass the necessary concurrent resolution approving this recommendation, the Service granted him permission to depart from the country voluntarily. But prior to his departure the case was reopened upon the complaint of Exarchou's wife, charging him with infidelity, and her request to withdraw her petition in his behalf. A hearing was held in June 1953, at which it appeared that the wife had become reconciled to her husband; but no findings of fact were made, as it was agreed that decision was to wait upon the results of a neighborhood investigation of relator by the Service. Later further hearings were held, and at their conclusion the Special Inquiry Officer, reversing the Service's earlier position, found that Exarchou had not sustained his burden of proof as to good moral character and hence was ineligible for the exercise of discretion which would allow him to depart voluntarily. This decision was affirmed by the Board of Immigration Appeals, and to it the Board has adhered in the face of several petitions to reconsider.
 
 
 3
 In 1954 relator became estranged from his wife, and she obtained a divorce on grounds of desertion in the fall of 1956. He has since remarried, however, and apparently is eligible for the relief he seeks but for the Service's rejection of his proof of good moral character. This adverse ruling was based on evidence as to relator's conduct in 1954 shortly after his first wife and he had separated. It seems that he then resided for a time at the home of a divorcee who lived with her two sons and her mother. Relator testified that, although he occasionally took this woman dancing in the evening and contributed money toward the rent of her home, their relationship was merely one of friendship and was not adulterous. She refused to answer questions at the 1956 hearing upon Fifth Amendment grounds; and there is no testimony at all contradicting relator's claim.
 
 
 4
 Relator, not the Immigration Service, has the burden of proof on the issue of his good moral character. Brownell v. Cohen, 102 U.S.App.D.C. 107, 250 F.2d 770. And indeed the ultimate decision whether or not to allow a deportable alien to leave the country voluntarily is committed to the discretion of the Attorney General and his subordinates. U. S. ex rel. Hintopoulos v. Shaughnessy, 353 U.S. 72, 77 S.Ct. 618, 1 L.Ed.2d 652; U. S. ex rel. Accardi v. Shaughnessy, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681. But in all respects the denial of a petition for voluntary departure must not be arbitrary or capricious. U. S. ex rel. Hintopoulos v. Shaughnessy, supra, 353 U.S. 72, 77, 77 S.Ct. 618, 1 L.Ed.2d 652; U. S. ex rel. Frangoulis v. Shaughnessy, 2 Cir., 210 F.2d 572, 574; U. S. ex rel. Partheniades v. Shaughnessy, supra, D.C.S.D.N.Y., 146 F.Supp. 772. As we have already noted, the Service on two previous occasions granted relator discretionary relief similar to that which he now seeks. We do not think the evidence is sufficient to justify the Service's present shift of position as to Exarchou's good moral character.
 
 
 5
 There is no doubt of the difficulties both for the administrative agency and for the courts in the determination of questions of this kind, depending on nuances of impressions as to human behavior, where outside witnesses are not available, and turning often on moral judgments unrealistic in modern society. Certainly here we cannot say that the agency, together with its appellate boards, has not accorded the relator fair and ample procedures; its many and patient hearings are commendable. But they also must reflect an inner doubt which their change of position suggests. Here they have convicted relator necessarily wholly on his statement and through application of a rigid rule of presumption. But presumptions as to facts should be only a reasonable substitute for definite proof; in other words, they should point to probabilities. Here we think the result departs from that standard.
 
 
 6
 As the Service concedes, no inference may be legally drawn from the refusal of the woman at whose home Exarchou briefly resided in 1954 to testify. United States v. Maloney, 2 Cir., 262 F.2d 535, 537. Actually the record indicates that avoidance of embarrassment was probably a stronger factor in her refusal than fear of self-incrimination. She had remarried by the time of the hearing and stated frankly that she was annoyed at being drawn into the proceedings and had sought and obtained advice as to means — which she took — to eliminate herself from a dispute in which she had no concern or interest. Exarchou's first wife did not testify at all after a hearing in 1954, nor was her actual testimony adverse then. Her only adverse comments were contained in her rambling, accusatory letter written when domestic ties between them were strained. Even if we overlook its hearsay quality we do not believe weight should attach to a letter written under such circumstances.
 
 
 7
 Hence the Service was thrown back completely on Exarchou's own testimony as to his conduct during the period in question. Perhaps the most doubtful fact here was the amount of money he admitted to having paid the woman, more than would be a reasonable rent under the circumstances. But he seems generally to have been free with his money. Beyond this his denials of adulterous conduct were steady, persistent, and unshaken. They would appear consistent with the surrounding facts and circumstances he disclosed. When he stayed with her he slept on a sofa in the living room. She slept in her bedroom on the second floor with a small son aged seven at the time of the hearing, and the other two bedrooms were occupied one by her mother and the other by her elder son of college age. Thus opportunity would seem not wholly propitious. These circumstances are quite different from those in Preisler v. United States, 2 Cir., 238 F.2d 238, certiorari denied 352 U.S. 990, 77 S.Ct. 387, 1 L.Ed.2d 368, relied on by the respondent. There a panel of this court, including the writer of this opinion, thought that the circumstances of past history and present opportunity affecting the principals were not such as to repel the inferences drawn. Here we feel that they are unless, indeed, we must go so far as to hold that any stay under the roof of a married lady inevitably signifies adultery.
 
 
 8
 It is of course true that questions of a witness' credibility must be left to the administrative fact finder. Ng Fung Ho v. White, 259 U.S. 276, 42 S.Ct. 492, 66 L.Ed. 938. Here, however, the Special Inquiry Officer's report demonstrates an incredulity not of the witness, but of the story itself.[1] The Officer simply did not believe it possible that a man who behaved like relator could not have been committing adultery. We do not think this finding of impossibility accords with the facts of human life. Moreover, we are disturbed by the insistence in the decision upon the appearance of good moral character. The statute makes good character itself, not a reputation for it, the finding necessary to the Service's decision. Preisler v. United States, supra, 2 Cir., 238 F.2d 238, certiorari denied 352 U.S. 990, 77 S.Ct. 387, 1 L.Ed.2d 368. Thus we cannot accept the Service's alternative conclusion that, even if Exarchou truthfully described his conduct, "a married man is not free to carry on such a relationship and still be considered one of good character."
 
 
 9
 We conclude only that Exarchou has sustained his burden of establishing good moral character under § 19(c) of the Immigration Act of 1917, former 8 U.S.C. § 155(c), and is entitled to further consideration of his application. Whether any other factors may warrant the Service in not following its 1951 and 1953 grants of discretionary relief to Exarchou is not now before us.
 
 
 10
 The decision of the district court is reversed, and the case remanded for the granting of the writ.
 
 
 
 Notes:
 
 
 *
 Sitting by designation pursuant to the provisions of 28 U.S.C. § 291 (a)
 
 
 [1]
 "* * * I think I can best sum up my impressions of the respondent by saying that he tells an interesting, almost fantastic, story. Certainly not one that I consider credible. In fact, I do not believe it. The respondent would have me believe that he continued this so-called platonic relationship with this woman out of the goodness of his heart and out of his sympathy for her at a time when he was admittedly separated from his own wife * * *. Even were it the truth, and as I say I do not believe it, it seems to me that a married man is not free to carry on such a relationship and still be considered one of good character. The mores of our times may well be most liberal but I do not think they have reached that degree of liberality as yet."