Lawrence **RASSANO**, Petitioner-Appellant,

v.

**IMMIGRATION AND NATURALIZATION SERVICE**, Respondent-Appellee.

No. 16714.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 28, 1973.

Decided Feb. 21, 1974.

Maurice J. Walsh, Anna R. Lavin, Chicago, Ill., for petitioner-appellant.

James R. Thompson, U. S. Atty., William T. Huyck, Asst. U. S. Atty., Chicago, Ill., Richard C. Owens, George W. Masterton, Crim. Div., U. S. Dept. of Justice, Washington, D. C., for respondent-appellee.

Before SWYGERT, Chief Judge, HASTINGS, Senior Circuit Judge, and O'SULLIVAN,* Senior Circuit Judge.

HASTINGS, Senior Circuit Judge.

In Rassano v. Immigration and Naturalization Service, 7 Cir., 377 F.2d 971 (Dec. 13, 1966), we considered the petition of Lawrence Rassano to review and set aside an order of his deportation and an order denying his request for suspension of deportation. A division of our court hearing the same denied such petition and affirmed both orders.

On February 1, 1967, petitioner filed his petition for a rehearing by virtue of three decisions of the Supreme Court handed down after our court had affirmed the orders of the Immigration and Naturalization Service. These decisions were Woodby v. Immigration and Naturalization Service, 385 U.S. 276, 87 S.Ct. 483, 17 L.Ed.2d 362 (Dec. 12, 1966); Garrity v. New Jersey, 385 U.S. 493, 87 S. Ct. 616, 17 L.Ed.2d 562 (Jan. 16, 1967); and Spevack v. Klein, 385 U.S. 511, 87 S. Ct. 625, 17 L.Ed.2d 574 (Jan. 16, 1967). Respondent INS answered and stated that the case should be remanded to the Board of Immigration Appeals (the Board) for reopening and further determination in view of these three decisions of the Supreme Court. We concurred in these suggestions and vacated our orders and remanded the cause as requested for further proceedings. *Rassano, supra,* 377 F.2d at 975.

The entire review and remandment proceedings are reported as above indi-

---

* Senior United States Circuit Judge Clifford O'Sullivan of the Sixth Circuit is sitting by designation.

cated and are incorporated herein by reference.

## DEPORTABILITY

In *Woodby, supra,* 385 U.S. at 283–286, 87 S.Ct. 483, 17 L.Ed.2d 362, the Court noted that the standard of review previously adopted by the Board in determining the validity of a deportation order was whether there was "reasonable, substantial, and probative evidence" to support it. The Court rejected this standard., Instead, the Court said: "We hold that no deportation order may be entered unless it is found *by clear, unequivocal, and convincing evidence* that the facts alleged as grounds for deportation are true." 385 U.S. at 286, 87 S.Ct. at 488 (emphasis added).

In *Spevack, supra,* 385 U.S. at 514, 87 S.Ct. 625, 17 L.Ed.2d 574, and in *Garrity, supra,* 385 U.S. at 496–498, 87 S.Ct. 616, 17 L.Ed.2d 562, the Court held that no inference may be drawn against one who chooses to exercise his right to remain silent. It appeared in the instant case that the special inquiry officer had prejudicially considered that petitioner had declined to answer questions before a grand jury on a claim of privilege.

On remand the Board rejected petitioner's contentions that the special inquiry officer, as the hearer of the facts, should initially determine whether the INS has sustained its burden of proof as to deportability by clear, unequivocal and convincing evidence, and whether denial of discretionary relief is justified.

The Board reconsidered both issues on the record as it stood and on August 29, 1967, held on the issue of deportability "that the [petitioner] has not met his burden of proving he is a United States citizen, that the Service has established by competent evidence that is clear, convincing and unequivocal that the [petitioner] is an alien and that he was convicted after entry of two crimes involving moral turpitude not arising out of a single scheme of criminal misconduct."

On its face, this appears to be a restatement by the Board of its prior holding couched in the language of the Supreme Court and not much else.

Further, the Board stated that "[o]n the issue of suspension of deportation, we find, without drawing an adverse inference from the [petitioner's] failure to testify before a grand jury, that his connection with gambling and questionable associates, viewed in light of his criminal background, require the finding, despite favorable factors of record, that he has failed to establish he is a person of good moral character or that he is worthy as a discretionary matter of the privilege of the suspension of his deportation." The Board thereupon ordered that no change be made in its prior order.

In all candor, we feel compelled to observe that in further following the mandates of the Supreme Court on petitioner's right to silence, the Board appears merely to have given lip service to this requirement but otherwise left its findings and orders unchanged.

On February 8, 1968, petitioner again sought review in this court of the Board's latest final order of August 29, 1967. Subsequently, however, the Board granted petitioner's motion to reopen the deportation hearing because of changed circumstances arising from the death of petitioner's younger son in March 1968 while on duty in Vietnam. After a further hearing and a new decision by the special inquiry officer adverse to petitioner, the Board, on April 2, 1973, dismissed an appeal therefrom and again ordered that petitioner be deported pursuant to its order of August 29, 1967.

We now have before us for review the final orders of the Board entered August 29, 1967 and April 2, 1973. Thus, since our original opinion in this case was handed down on December 13, 1966, this matter has been in litigation for 6 years, 9 months and 15 days until final argument here on September 28, 1973.

At the outset it must be said that in the light of *Woodby,* we entertain serious doubts as to the validity of the Board's determination of deportability

without first requiring a fact-finding decision by the special inquiry officer. See Rodriques v. Immigration and Naturalization Service, 3 Cir., 389 F.2d 129, 132–133 (1968); Waziri v. Immigration and Naturalization Service, 9 Cir., 392 F.2d 55, 57 (1968).

We have examined each of the many cases which have cited *Woodby*. In the various remandments for reconsideration a wide variety of actions have been taken by the Board and almost all have been approved on subsequent review by the federal courts of appeal. It is quite clear that *Woodby* applies only to a deportation proceeding and not to the exercise of discretionary relief by the Attorney General. See Hyppolite v. Immigration and Naturalization Service, 7 Cir., 382 F.2d 98, 99 (1967). In the initial decision in *Rassano, supra,* our court found and held that petitioner was deportable. 377 F.2d at 974. No additional evidence was offered at the Board hearing on remand relating to petitioner's deportability.

Without further considering this question in the instant appeal, we accept the fact that in this case Rassano has been properly found to be deportable, and that part of the order appealed from is affirmed.

## DISCRETIONARY RELIEF

The next and more important question for consideration is whether the Attorney General abused his discretion in denying petitioner's application for the discretionary suspension of deportation under Section 244(a)(2) of the Immigration and Nationality Act, 8 U.S.C. § 1254(a)(2). This section of the Act provides that an alien in petitioner's situation is subject to consideration for such discretionary relief provided that he "has been physically present in the United States for a continuous period of not less than ten years immediately following the commission of an act, or the assumption of a status, constituting a ground for deportation, and proves that during all of such period he has been and is a person of good moral character; and is a person whose deportation would, in the opinion of the Attorney General, result in exceptional and extremely unusual hardship to the alien or to his spouse, parent, or child, who·is a citizen of the United States or an alien lawfully admitted for permanent residence."

The Service concedes that petitioner has met the ten-year continuous residence requirement. However, at the conclusion of the several reopened hearings, the special inquiry officer considered the entire record and found that "[a]part from the tragic loss of the respondent's son in Vietnam, the evidence in these reopened hearings is merely more of what went before," and denied the suspension of deportation as a matter of administrative discretion.

On appeal, the Board noted that the special inquiry officer had made no finding this time whether petitioner was a person of good moral character or whether exceptional and extremely unusual hardship would result. He had previously found the existence of the requisite hardship but had concluded petitioner was not a person of good moral character, and was therefore ineligible as a matter of law and did not warrant the exercise of discretion in this case. The Board examined the new evidence *de novo* and agreed in all things with the special inquiry officer, dismissed the appeal and ordered petitioner deported to Italy. The instant petition for review followed.

We have carefully examined the entire record presented to us, including the documentary evidence in the supplemental certified administrative record. We have considered in detail the contentions of the parties and the authorities cited. We submit that the following summary is factually correct.

Petitioner Lawrence Rassano, a native and national of Italy, arrived in the United States with his parents on May 1, 1914, and was admitted for permanent residence. He was then at the age of

about six months. He has lived in this country continuously since that date and has never returned to Italy and does not speak the Italian language. He has no known friends or relatives abroad. He was under the impression that his father had become a naturalized citizen of this country but was unable to establish this fact.

He married a United States citizen and to this union were born two citizen sons, *viz.*: Robert, born July 16, 1943, and William, born May 9, 1947. His wife suffered a terminal illness of leukemia for two years and died July 27, 1959, at which time Robert was age 16 and William was 12. Mrs. Rassano was buried in the Chicago area. During her terminal illness, petitioner maintained their home, did the cooking, laundry and cleaning and cared for his wife who was bedridden for a period prior to her death.

Following the death of his wife in 1959, petitioner's oldest son, Robert, married and resettled. Petitioner's other son, William, continued to live with him until he joined the United States armed forces in mid-1967. He was sent on active duty to Vietnam as a member of the 25th Infantry Division. While on a search and destroy mission near Saigon he was killed in ambush by enemy fire on March 2, 1968. His remains were returned to this country and he was given a military burial next to his deceased mother in Mount Carmel Cemetery. Petitioner frequently visits the graves of his deceased wife and son and cares for them.

Following his son William's death, petitioner received letters of profound sympathy and words of praise from William's Company Commander; the Commanding General of the 25th Division; the Chief of Staff of the United States Army; the Commanding General of the armed forces in Vietnam, General W. C. Westmoreland; President Lyndon B. Johnson; Governor Otto Kerner; Senator Charles H. Percy; the Secretary of the Army; and other state and municipal officials.

After William's death, petitioner's son Robert and his family moved in with petitioner in the home which he owns in Berwyn, Illinois, where they have since lived together for comfort and company. Robert pays no rent but helps maintain the house.

The record shows and petitioner concedes that in 1934 he was convicted of the offense of robbery and was sentenced to a prison term of from one year to life, but actually was required to serve only six months of that sentence. He also admits that he was convicted in 1952 of the crime of burglary and sentenced to five years' probation and was never required to suffer imprisonment during such period of probation. Petitioner has had no subsequent convictions during the past 21 years.

The Immigration and Naturalization Service conducted investigations of petitioner's life habits, employment, associations, acquaintances, ownership of his home, income, investments and general moral character. It was furnished with pertinent documentary material, *viz.*: income tax returns, financial statements and affidavits of petitioner's neighbors attesting to his good moral character.

All of the foregoing hearings and reopened hearings were conducted by the same special inquiry officer, whose recommendations were approved by the Board. Petitioner has been represented throughout these proceedings by the same attorneys.

The final conclusion reached by the Service was that, although petitioner's deportation would result in exceptional and extremely unusual hardship to him, yet petitioner had failed to establish that he' was a person of good moral character and that he warranted the favorable exercise of the Attorney General's discretion in this case. The appeal for discretionary relief was denied.

We have made a meticulous and extended examination of the determinations made by the special inquiry officer

and the Board and feel compelled to conclude that there has been an abuse of discretion in the denial of discretionary relief to petitioner. We are convinced that a mistake has been made.

This case is completely unlike the usual and frequent cases where we are asked to review the denial of discretionary relief under Section 243(h) of the Immigration and Nationality Act. The cases are legion where we have upheld the Board. See, *e. g.*, Hyppolite v. Immigration and Naturalization Service, 7 Cir., 382 F.2d 98 (1967); Lena v. Immigration and Naturalization Service, 7 Cir., 379 F.2d 536 (1967).

In the usual case we find an alien applying for admission to this country as a matter of his own choice. He represents that he seeks admission for a stated purpose. He may then be admitted for a fixed period of time for such purpose, and often at the request of his native government. The alien likes what he finds here and wants to stay. As a matter of grace he is either granted or denied such relief. The courts have bent a sympathetic ear to the discretion vested in the Attorney General, even though it frequently becomes a contest between the alien and the Service on how long the proceedings may be protracted.

In the instant case, however, we find a six months old baby, born in Italy, brought here by his parents to live a rather full lifetime and grow up to become a creature of the environment of the United States. He had no choice in the matter. He knows no other country. He has no relatives in Italy. They all live here and are citizens of this country. He does not speak the Italian language. He has only a meager education and no particular trade or skill. He gets such work as he can with the handicap of an old criminal record.

Beginning with the issuance of the original show cause order by the Service on January 26, 1961, this matter has been in litigation for a period of almost 13 years. Cutting through the maze of debris leading to the final administrative determination, we find some things to be self-evident.

Petitioner's two criminal convictions have grown rather stale after 39 and 21 years, respectively. There have been a few other arrests without a conviction. The inescapable truth is that he has served a total of six months in prison during his lifetime. He is now more than 60 years of age.

He has worked as a "general manager" in at least two cafe lounges with girl entertainers for four years at a compensation of $150.00 per week. The special officer found petitioner's story of his weekly wages to be "unbelievable." He also found petitioner's testimony as to his other activities to be "so vague, evasive and fantastic as to be unbelievable, except where it is corroborated." These findings demonstrate "an incredulity not of the witness, but of the story itself." See United States ex rel. Exarchou v. Murff, 2 Cir., 265 F.2d 504, 507 (1959). The officer could not believe it possible that a man who so spoke could have a good moral character. In our judgment, we do not believe that "this finding of impossibility accords with the facts of human life." *Id.*

█ Petitioner had the burden of establishing that he was and now is a person of good moral character during the ten-year period as required in Section 1254(a)(2), *supra*. On brief, the Service concedes that this section is none too clear as to when the ten-year period is to begin. It concluded that Congress meant the period immediately preceding the date of the suspension application, which was May 22, 1963. However, the Service agrees that granting petitioner's request in May of 1968 for reconsideration of that application had the effect of updating the ten-year period. But we further agree that petitioner's conduct prior to the ten-year period may properly be considered in determining whether petitioner was a person of good moral character throughout the requisite period and still is such a person.

Petitioner admitted that he had been a friend of one Joseph Aiuppa for more than 20 years and was frequently in his company. Petitioner testified that he does not work for Aiuppa, but often drives him in petitioner's car as a personal courtesy and helps with Aiuppa's yard work, all without compensation. The special officer characterized Aiuppa as "the notorious Joey Aiuppa." It was shown that Aiuppa had been convicted once of illegally transporting mourning doves across state lines. The officer also considered and credited, over objection, a portion of a report of Hearings before the Permanent Subcommittee on Investigations of the Senate Committee on Government Operations held May 22, 1963. This portion contained an affidavit of the Cook County (Illinois) State's Attorney's chief investigator that Aiuppa was a notorious hoodlum and gangster in the Chicago area engaged in the business of prostitution and gambling. Aiuppa's interest in several named "Lounge" activities was shown. Newspaper publicity concerning Aiuppa was introduced and considered.

Petitioner was shown to have been employed in certain of these entertainment businesses at times. He was shown to have owned at one time for several months a small interest in a place called the Frolics in which Aiuppa was a part owner. Petitioner was also shown to have owned about 30 shares in a place called the Towne Hotel, but nothing came of the purchase of these shares. The Towne Hotel was said to have been known as a center of prostitution and gambling.

Based upon additional reported incidents and petitioner's disclosures it was established that in 1964 petitioner had $8,400 cash in his safety deposit box in a bank and other assets of about $18,000, with liabilities of an $11,000 mortgage on his home and current living expenses.

Also considered by the inquiry officer concerning petitioner's criminal record was the fact that in 1964 petitioner appeared before a federal grand jury, at which time he refused to give any information except his name and address on the constitutional ground that his answers might tend to incriminate him.

We shall not further burden this opinion with additional details relating to petitioner. It is sufficient to say that petitioner was found to have failed to discharge his burden of establishing his good moral character because of his association with Joseph Aiuppa. This appears to be a clear case of guilt by association. Such has been proscribed in criminal cases by the courts over the years. Brooks v. United States, 5 Cir., 416 F.2d 1044, 1048 (1969), cert. denied, 400 U.S. 840, 91 S.Ct. 81, 27 L.Ed.2d 75 (1970); Ramirez v. United States, 9 Cir., 363 F.2d 33, 34–35 (1966).

We recognize that the instant proceeding is a civil action. However, the Supreme Court in *Woodby, supra,* 385 U.S. at 285, 87 S.Ct. at 488, in contrasting a deportation proceeding with a criminal prosecution, stated that "[t]his Court has not closed its eyes to the drastic deprivations that may follow when a resident of this country is compelled by our Government to foresake all the bonds formed here and go to a foreign land where he often has no contemporary identification. In words apposite to the question [of the degree of proof] before us, we have spoken of 'the solidity of proof that is required for a judgment entailing the consequences of deportation, particularly in the case of an old man who has lived in this country for forty years  .  .  . ," citing Rowoldt v. Perfetto, 355 U.S. 115, 120, 78 S.Ct. 180, 2 L.Ed.2d 140 (1957).

In its concluding presentation to us on this appeal the Service notes that petitioner has had no difficulty with the law in recent years, yet urges that highly credible evidence links him to gambling and prostitution through his employment and investments. It then immediately follows with the Board's statement that petitioner "is also an acknowledged close associate of Joseph Aiuppa, whose leading position in gambling, prostitution

and other forms of vice in the Cicero area is well established in this record."

We have no brief for Mr. Aiuppa nor do we hold up petitioner as a model of exemplary conduct. However, it has become crystal clear to us that the thread which holds this fabric together is inextricably comprised of fibers of hearsay and guilt by association. Such reeds are too slender for this cloth.

We readily recognize the statutory requirements, as well as established case law, relating to the question under consideration here. Since petitioner has been found to be a deportable alien under Section 1251(a)(4) of the Act on criminal grounds, in seeking suspension of deportation he must proceed here under Section 1254(a)(2), *supra*. The approval or disapproval of Congress of the suspension application thus far has not been applicable here since Congress takes no part in unfavorable administrative action. See Section 1254(c).

Under Section 1254(a)(2) the applicant must show, as earlier herein set out, (1) that he has met the continuous ten-year residence requirement; (2) that during all of such period he has been and is a person of good moral character; and (3) that he is a person whose deportation would "result in exceptional and extremely unusual hardship to the alien." It was found by the Board that petitioner has satisfied the ten-year requirement and that his deportation would result in exceptional and extremely unusual hardship to him.

■■ This leaves at issue only the question of petitioner's good moral character during the relevant ten-year period. It is well settled that the burden of such proof lies on the petitioner and that he must show that he merits the granting of such relief in the discretion of the delegated agency. Further, this court may not substitute its judgment for that of the official agency.

■ However, it appears to be well settled that the ultimate exercise of administrative discretionary denial of suspension is reviewable on appeal. Such appellate review is for the purpose of determining whether the agency action was arbitrary or capricious or an abuse of discretion. See, *e. g.*, United States ex rel. Hintopoulos v. Shaughnessy, 353 U.S. 72, 77, 77 S.Ct. 618, 1 L.Ed.2d 652 (1957); Foti v. Immigration and Naturalization Service, 375 U.S. 217, 228–229, 84 S.Ct. 306, 11 L.Ed.2d 281 (1963); Wong Wing Hang v. Immigration and Naturalization Service, 2 Cir., 360 F.2d 715 (1966); Kam Ng v. Pilliod, 7 Cir., 279 F.2d 207, 210–211 (1960), cert. denied, 365 U.S. 860, 81 S. Ct. 828, 5 L.Ed.2d 823 (1961).

■ Obviously such judicial review does not require us to rubber stamp Board action, even though in the vast majority of cases, with good reason, we have affirmed. In the instant case the Board has found strong evidence of petitioner's good moral character because of the events following the tragic loss of his son in Vietnam and in his earlier family care during his wife's prolonged suffering from leukemia, and, following her death, in the care of his young sons. The Board found, however, that this was overcome because of the showing that petitioner's income was principally derived from prostitution and gambling and because of his vague and evasive answers to questions concerning his income and employment. Stripped of the consideration of evidence proscribed by the Supreme Court and the drawing of unjustified inferences, we feel bound to conclude that the subordinates of the Attorney General abused their discretion in finding that petitioner had failed to establish his good moral character during the requisite period, and that he thereby failed to show that he merited the discretionary relief requested.

Whether we apply the reasonable, substantial and probative evidence test on the record considered as a whole, suggested in *Wong Wing Hang, supra,* 360 F.2d at 717; or consider that the decision is not based on a reasonable foundation, as in Khalil v. Immigration and Naturalization Service, 9 Cir., 457 F.2d

1276, 1277 (1972); we are convinced that a mistake has been made.

To affirm here would be to exile this petitioner to a foreign country for the remainder of his life. To invoke this extreme penalty under all of the facts in this case relevant for consideration, in our considered judgment, goes too far.

In light of the foregoing, the order of the Board denying petitioner discretionary relief is reversed. This holding is limited to the unusual factual situation present in this case and is not otherwise to be considered as precedent.

The petition is granted and the order of deportation is affirmed and the order denying discretionary relief is reversed.

Affirmed in part.

Reversed in part.