**Jagdish Rai CHADHA, Petitioner,**

v.

**IMMIGRATION AND NATURALIZATION SERVICE, Respondent.**

No. 77–1702.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted before a panel consisting of Ely, Carter and Kennedy, Circuit Judges, April 10, 1978.

Submission ordered withheld,
April 14, 1978.

Reassigned to a panel consisting of Ely, Kennedy and Hug, Circuit Judges,
Aug. 13, 1980.

Resubmitted and Decided Dec. 22, 1980.

Rehearing and Rehearing En Banc
Denied March 25, 1981.

Alan B. Morrison, Larry P. Ellsworth, Washington, D. C., John M. Pohlman, San Francisco, Cal., for petitioner.

John M. Harmon, Dept. of Justice, Washington, D. C., argued, for respondent; Henry C. Petersen, Washington, D. C., on brief.

Eugene Gressman, Washington, D. C., amicus curiae, for U. S. House of Representatives.

Cornelius B. Kennedy, Washington, D. C., amicus curiae, for U. S. Senate.

Before ELY, KENNEDY and HUG, Circuit Judges.

KENNEDY, Circuit Judge:

Petitioner, Jagdish Rai Chadha, seeks review of an order of deportation issued by the Immigration and Naturalization Service (INS). The Executive branch of the Government, acting by an inquiry officer who conducted an administrative hearing on the record, determined that Chadha, though otherwise deportable, should remain in the United States to avoid extreme hardship. Subsequently the Congress, acting only by the House of Representatives, sought to reverse that determination. If given effect, the congressional action would require Chadha's deportation. We hold that the statutory mechanism by which the Congress acted to reverse the administrative determination is unconstitutional, and therefore that the deportation order is invalid.

Chadha, a native of Kenya and a holder of a British passport, lawfully entered the United States as a nonimmigrant student in 1966. After he received his bachelor's and his master's degrees, his student visa expired in 1972. In 1974, the INS issued an order to show cause why Chadha should not be deported. A special inquiry officer then held a deportation hearing pursuant to Immigration and Nationality Act (INA) section 242(b), 8 U.S.C. § 1252(b) (1976). At the hearing, Chadha conceded his deportable status, but requested a suspension of deportation pursuant to INA section 244(a)(1), 8 U.S.C. § 1254(a)(1) (1976). The special inquiry officer granted Chadha's request, in part because he found that "it would be extremely difficult, if not impossible, for [Chadha] to return to Kenya or go to Great Britain by reason of his [East Indian] racial derivation."

At the close of the hearing, the officer found that Chadha met the requirements of section 244(a)(1): he had been in the United States for over seven years, was of good moral character and would suffer "extreme hardship" if deported. The officer then suspended deportation pending congressional action. The officer further ordered, however, that the proceedings would be reconvened should Congress take adverse action.

On December 16, 1975, the House of Representatives passed House Resolution 926 disapproving the suspension of Chadha's deportation. 121 Cong.Rec. 40,800 (1975). This disapproval had the effect of overriding the special inquiry officer's decision. INA § 244(c)(2), 8 U.S.C. § 1254(c)(2) (1976). Accordingly, Chadha's deportation proceedings were reconvened, and the INS special inquiry officer entered a final order of deportation. Chadha then unsuccessfully appealed to the Board of Immigration Appeals and now petitions this court pursuant to INA section 106(a), 8 U.S.C. § 1105a(a) (1976).

Chadha contends that the procedure for congressional disapproval provided by section 244(c)(2), 8 U.S.C. § 1254(c)(2) (1976), is unconstitutional. Although he raised this contention before both the special inquiry officer and the Board of Immigration Appeals, neither decided this question as both concluded they had no power to decide the constitutionality of statutes. On this petition for review, respondent Immigration and Naturalization Service agrees that section 244(c)(2) is unconstitutional. We therefore requested both the House of Representatives and the Senate to file briefs as amici curiae. *See, e. g., Cheng Fan Kwok v. INS*, 392 U.S. 206, 210 n.9, 88 S.Ct. 1970, 1973 n.9, 20 L.Ed.2d 1037 (1968); *Atkins v. United States*, 556 F.2d 1028, 1058 (Ct.Cl. 1977) (per curiam) (en banc), *cert. denied*, 434 U.S. 1009, 98 S.Ct. 718, 54 L.Ed.2d 751 (1978). They have done so, and before we reach the merits, we must first answer various challenges to our jurisdiction and the justiciability of Chadha's case.

I. Procedural Questions

A. *Jurisdiction*

Amici initially contend that this court lacks jurisdiction. Their claim is based on

INA section 106(a), 8 U.S.C. § 1105a(a) (1976), which states that a petition for review in the Court of Appeals "shall be the sole and exclusive procedure for the judicial review of all final orders of deportation . . . made against aliens within the United States pursuant to administrative proceedings under section 242(b) of this Act [8 U.S.C. § 1252(b)]." Citing this language, amici make two assertions. First, although they concede Chadha is subject to a final order of deportation, they argue that Chadha, by conceding deportability, has not challenged any determination made during "administrative proceedings"; rather, his challenge is to the House of Representatives' decision to disapprove the suspension of deportation. Second, amici contend that since the Board of Immigration Appeals lacked the power to pass on the INA's constitutionality, it could not make any order pursuant to section 242(b) which could form the basis of a petition challenging the validity of the congressional procedure.

■ Amici's first argument, that Chadha seeks review not of a decision made during "administrative proceedings" but of a legislative decision made outside of section 242(b), is without merit. Amici would have us read "final orders . . . made . . . pursuant to administrative proceedings under section 242(b)" to limit appellate review to only the actual decisions and conclusions made by the special inquiry officer during a section 242(b) hearing. We think that this construction of "final orders" is inconsistent with both congressional intent and a sensible interpretation of the statute. We conclude the phrase "final orders" includes all matters on which the validity of the final order is contingent, rather than only those determinations actually made at the hearing. Under amici's construction our review would be essentially empty, for we could review only the special inquiry officer's ministerial execution of a substantive decision that was made elsewhere.

Our construction is consistent with well established precedent in this circuit. In Waziri v. INS, 392 F.2d 55 (9th Cir. 1968), for example, an alien challenged the validi-

ty of an INS rescission of his permanent resident status. While this decision rendered Waziri immediately deportable, id. at 56–57, it was not appealable under section 106. See Bachelier v. INS, 548 F.2d 1157, 1158 (5th Cir. 1977). After a section 242(b) hearing Waziri was ordered deported. On petition to this circuit, he attempted to challenge the validity of the INS rescission, but was met with the argument that the rescission was a determination made outside of a section 242(b) proceeding and thus was not reviewable under section 106. The court rejected this argument, stating that section 106 included the power to review "logical predicates" to deportation orders that are "integrally related" to and interdependent with the final order. 392 F.2d at 56–57. The INS rescission order belonged to this class: it rendered an alien immediately deportable, was not directly appealable, and reduced the section 242(b) proceeding to a mere execution of the consequences of being deportable. The court reasoned that if section 106 did not permit review, the possibility existed for numerous other challenges, by way of district court habeas corpus petitions, to the same deportation order. Id. at 57. This was found contrary to the congressional intent of consolidating review of deportation orders. Id. Further, since the "technical correctness" of the order could not be questioned, the court found that Congress would not have desired such a "routine" or "perfunctory" approval of deportation orders in the Court of Appeals. Id. In such cases then, the court found that the power of review under section 106 permitted review of the substantive matters underlying the final deportation order. See also Bachelier v. INS, 625 F.2d 902, 904 (9th Cir. 1980); Ferrante v. INS, 399 F.2d 98 (6th Cir. 1968).

Waziri's rationale extends to Chadha's case. Like the status rescission involved in Waziri, the congressional disapproval of section 244(c)(2) is a substantive decision made outside of a section 242(b) proceeding but which nevertheless directly leads to a final order of deportation. In addition, if we find that section 106 precludes review, the distinct possibility exists that there will be

numerous other hearings in the federal system on the constitutionality of section 244(c)(2). Finally, the necessary interdependence is present: a congressional disapproval under section 244(c)(2) leads proximately and automatically to a final deportation order, is not directly appealable, and results in a mere ministerial execution of its terms in the actual section 242(b) proceeding. Following *Waziri*, we find that the congressional disapproval under section 244(c)(2) is the type of action that is integrally related to a final deportation order and that section 106 permits substantive review. We hold that the phrase "final orders ... made ... pursuant to administrative proceedings under section 242(b)" encompasses review not only of determinations actually made at a section 242(b) hearing, but also of the legal validity of determinations on which the final order of deportation is contingent.

*Cheng Fan Kwok v. INS*, 392 U.S. 206, 88 S.Ct. 1970, 20 L.Ed.2d 1037 (1968), relied upon by amici, is not contrary. In that case, the Court held that a circuit court had no jurisdiction to review a denial of a stay of deportation, an order controlled not by section 242(b) but by administrative regulations. Further, the alien in *Cheng Fan Kwok* had filed for the discretionary relief *after* a final order of deportation had been entered, whereas Chadha's request here was made at his deportation hearing. Thus, Cheng was not appealing from a final order, but rather was appealing from an independent denial of discretionary relief. Following its prior case of *Foti v. INS*, 375 U.S. 217, 84 S.Ct. 306, 11 L.Ed.2d 281 (1963), the Court then found that the Attorney General's denial of Cheng's application for discretionary relief, independent of a final order of deportation, was not a determination "made during and incident to the administrative proceeding," *Foti*, 375 U.S. at

229, 84 S.Ct. at 314, and thus held that the circuit court lacked jurisdiction. *Cheng Fan Kwok*, 392 U.S. at 215–18, 88 S.Ct. at 1975. *See also Reyes v. INS*, 571 F.2d 505, 507 (9th Cir. 1978); *Ruiz–Mancilla v. INS*, 571 F.2d 510 (9th Cir. 1978). In formulating its holding, the Court in *Cheng Fan Kwok* stated that section 106 extended jurisdiction not only to petitions challenging orders entered during section 242(b) proceedings, but also to petitions "directly challenging deportation orders themselves." 392 U.S. at 215, 88 S.Ct. at 1975.

Chadha's deportation order in the second administrative proceeding flowed directly from the one–house disapproval. In the first stage of his deportation hearing, Chadha applied for and received a suspension of deportation. Congress then disapproved of his suspension. The Attorney General, in accordance with section 244(c)(2), then began to have Chadha "deport[ed] ... in the manner provided by law" by reconvening the original section 242(b) proceeding and ordering Chadha deported. It blinks reality to hold, as amici urge, that such congressional action was not "incident to" the proceeding, *Foti*, 375 U.S. at 229, 84 S.Ct. at 314, or "integrally related" to Chadha's deportation order, *Waziri*, 392 F.2d at 56. As the validity of the final deportation order is contingent upon the validity of the congressional action under section 244(c)(2), Chadha is very clearly "directly challenging [the] deportation order [itself]," *Cheng Fan Kwok*, 392 U.S. at 215, 88 S.Ct. at 1975, and thus jurisdiction exists under section 106.[1]

The consequences of finding an absence of jurisdiction would, moreover, be directly contrary to Congress' intent in enacting section 106. All parties agree that if jurisdiction is absent, Chadha would be relegated to challenging the INA's constitutionality in a district court habeas corpus petition.

---

1. In *Giova v. Rosenberg*, 379 U.S. 18, 85 S.Ct. 156, 13 L.Ed.2d 90 (1964) (per curiam), *Foti* was extended to motions to reopen deportation hearings. *Cheng Fan Kwok v. INS*, 392 U.S. 206, 88 S.Ct. 1970, 20 L.Ed.2d 1037 (1968), harmonized these two decisions by stating that aliens may seek review, under section 106, of determinations which are " 'intimately and im-

mediately associated' with the final order they seek to challenge." *Id.* at 217, 88 S.Ct. at 1976. Further, the Court found that "Congress quite deliberately restricted the application of § 106(a) to orders entered during proceedings conducted under § 242(b), or directly challenging deportation orders themselves." *Id.* at 215, 88 S.Ct. at 1975.

Such a procedure would fly in the face of the explicit congressional intent "to expedite the deportation of undesirable aliens by preventing successive dilatory appeals to various federal courts . . . ." *Foti v. INS,* 375 U.S. 217, 226, 84 S.Ct. 306, 312, 11 L.E.2d 281 (1963). Congressional intent, as expressed by the author of the bill that was eventually to become section 106, was that "[i]nstead of the multitudinous and repetitive court reviews now available by virtue of judicial interpretations, . . . a special single form of judicial review by the court of appeals [would be set up]." 107 Cong.Rec. 12,176 (1961) (Remarks of Rep. Walters). *See also* H.Rep.No. 565, 87th Cong., 1st Sess. 1, 3, 13 (1961); Note, *Deportation and Exclusion: A Continuing Dialogue Between Congress and the Courts,* 71 Yale L.J. 760 (1962).

Amici would have us ignore this history. To adopt their position, in cases where both deportability and the INA are challenged, would require one hearing in the court of appeals on deportability and, if all appeals are taken, potentially three other hearings in the federal court system on the constitutional challenge. The waste of judicial resources and the delay entailed by such a scheme directly contradict Congress' intent to have one "single, separate, statutory form of judicial review." H.Rep.No. 565, 87th Cong., 1st Sess. 1 (1961). *See Marcello v. Attorney General,* 495 F.2d 171, 173 (D.C. Cir.1974) (Leventhal, J.). Further, Congress was acutely aware that many of the dilatory judicial proceedings it sought to limit included constitutional attacks on the INA. H.Rep.No. 565, *supra,* at 2, 11. It would be anomalous then, for Congress to provide a single form of review for deportability determinations, yet preclude from that same appeal any questions of the INA's constitutionality.[2] We reject amici's construction of section 106 and find that review of final deportation orders includes

review of matters upon which the final order is contingent.

Amici's second argument, that since the INS was unable to adjudicate the INA's constitutionality it could make no finding forming the basis of constitutional review under section 106, misconceives the nature of our review. It is immaterial that the INS lacked the power to pass on the INA's constitutionality. The adjudication of constitutional questions has, and always will be, the primary responsibility of the Judiciary. As we recently stated in *Hernadez–Rivera v. INS,* 630 F.2d 1352, 1355 (9th Cir. 1980), the task of passing on the constitutionality of the INA "is within the exclusive province of the federal courts." Thus, this court, as well as courts of other circuits, has found jurisdiction under section 106 to adjudicate the constitutionality of the INA. *See, e. g., Hernandez–Rivera, supra; Menezes v. INS,* 601 F.2d 1028, 1032–35 & n.7 (9th Cir. 1979); *Rubio de Cachu v. INS,* 568 F.2d 625, 627 (9th Cir. 1977); *Pilapil v. INS,* 424 F.2d 6, 9 (10th Cir.), *cert. denied,* 400 U.S. 908, 91 S.Ct. 752, 27 L.Ed.2d 147 (1970); *Te Kuei Liu v. INS,* 483 F.Supp. 107, 108 (S.D.Tex.1980) (restating earlier unpublished findings); *Shodeke v. Attorney General,* 391 F.Supp. 219 (D.D.C.1975); *Riva v. Attorney General,* 377 F.Supp. 1286, 1288 (D.D.C.1974) (per curiam) (three–judge court). *But see Andres v. INS,* 460 F.2d 287 (6th Cir. 1972).

Indeed, amici's argument would produce untenable results. Their argument is that deportable aliens could only raise the unconstitutionality of the INA in separate proceedings in district courts. But *Riva v. Attorney General, supra,* is directly contrary. There, an alien appealed only his deportability determination to the circuit court and later challenged the INA's constitutionality in district court. The three–judge court found that section 106 vested in the circuit courts the exclusive jurisdiction

---

**2.** Both *Foti,* 375 U.S. at 227 n.14, 84 S.Ct. at 313 n.14, and *Cheng Fan Kwok,* 392 U.S. at 216 n.16, 88 S.Ct. at 1976 n.16, declined to pass on the pendent jurisdiction of courts to review determinations not made in a section 242(b) proceeding. *See* Note, *Jurisdiction to Review*

*Prior Orders and Underlying Statutes in Deportation Appeals,* 65 Va.L.Rev. 403 (1979). Here, however, that question is not presented as we hold that the congressional disapproval is directly reviewable under section 106.

to determine the INA's constitutionality. It stated the Riva's "failure to timely raise these issues cannot negate [section 106's] exclusive jurisdictional grant," and dismissed the action. Thus, were we to adopt amici's construction, aliens subject to deportation could never raise the constitutionality of the INA, a result that we decline to adopt. *See Johnson v. Robison*, 415 U.S. 361, 366–74 & n.8, 94 S.Ct. 1160, 1165 & n.8, 39 L.Ed.2d 389 (1974). Section 106 thus gives us jurisdiction to decide Chadha's claim.

B. *Justiciability*

Amici next contend that Chadha's claim is nonjusticiable. Specifically, they allege that Chadha does not have standing, that his case presents a political question, and that, since the INS has agreed that section 244(c)(2) is unconstitutional, his case lacks the necessary adverseness. We address each of these claims in turn.

1. Standing

The "case or controversy" requirement of article III is satisfied when a party demonstrates "injury in fact and a substantial likelihood that the judicial relief requested will prevent or redress the claimed injury. . . ." *Duke Power Co. v. Carolina Environmental Study Group*, 438 U.S. 59, 79, 98 S.Ct. 2620, 2633, 57 L.Ed.2d 595 (1978). Further, the Court has stated that "parties with sufficient concrete interests at stake have been held to have standing to raise constitutional questions of separation of powers with respect to an agency designated to adjudicate their rights." *Buckley v. Valeo*, 424 U.S. 1, 12 n.10, 96 S.Ct. 612, 631 n.10, 46 L.Ed.2d 659 (1976) (per curiam). Against this background, amici attack Chadha's standing on three fronts. They claim that Chadha has suffered no injury in fact, that he is asserting a nonjusticiable generalized government grievance, and that he is impermissibly asserting the rights of others.

While amici's claim that Chadha has not suffered an injury in fact may seem odd, inasmuch as Chadha is here contesting his

deportation, amici argue that the INA subsection that Chadha attacks is part of an indivisible and unseverable whole. In other words, they argue that Chadha's attack on section 244(c)(2) necessarily includes an attack on all of section 244. This is relevant, they claim, because Chadha's deportation was suspended pursuant to section 244(a), and if all of section 244 is invalidated, there would then be no authority for the Executive's discretionary grant of suspension, and he would be deportable in any event. Amici conclude that if Chadha succeeds, we must invalidate the very section which allows him to remain in this country. It is argued that without such authority, Chadha must be deported regardless of our result and, therefore, he suffers no injury in fact.

 In considering the general principle of severability, the Supreme Court has said:

Unless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law.

*Buckley v. Valeo*, 424 U.S. 1, 108, 96 S.Ct. 612, 677, 46 L.Ed.2d 659 (1976) (per curiam) (quoting *Champlin Refining Co. v. Corporation Comm'n*, 286 U.S. 210, 234, 52 S.Ct. 559, 564, 76 L.Ed. 1062 (1932)). In addition, where Congress has enacted a severability clause, the Court has stated:

This provision reverses the presumption of inseparability [and] establish[es] the opposite presumption of divisibility. Congress has thus said that the statute is not an integrated whole. . . . On the contrary, when the validity is in question, divisibility and not integration is the guiding principle. Invalid parts are to be excised and the remainder enforced.

*Electric Bond & Share Co. v. SEC*, 303 U.S. 419, 434, 58 S.Ct. 678, 683, 82 L.Ed. 936 (1938). *See also United States v. Jackson*, 390 U.S. 570, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968); *Pearce v. Wichita County*, 590 F.2d 128, 131–32 (5th Cir. 1979).[3]

Here, Congress has enacted a severability clause. Section 406 of the INA states that

**3.** In *Jackson*, the Court held that, notwithstanding the absence of a severability clause,

the death penalty provision of the Federal Kidnaping Act was severable from the rest of the

"[i]f any particular provision of this Act, or the application thereof to any person or circumstance is held invalid, the remainder of the Act and the application of such provisions to other persons or circumstances shall not be affected thereby." Thus, those who seek to establish inseverability bear the burden, under *Electric Bond & Share Co., supra,* to demonstrate that "it is evident" that Congress "would not have enacted those provisions within its power" without section 244(c)(2). *Champlin Refining Co., supra.*

■ This burden has not been met. At most, amici's citation to the many Immigration and Nationality Act amendments shows that when the several Congresses were presented with the question of the Attorney General's discretion, they preferred to retain some supervisory power, rather than relinquish it. It has not, however, been shown that the rest of section 244 is not "functionally independent," *United States v. Jackson,* 390 U.S. at 586, 88 S.Ct. at 1218, or that a "total frustration" of Congress' basic purpose would attend section 244(c)(2)'s invalidation. *Id.* at 591, 88 S.Ct. at 1221. Indeed, the legislative history of the INA's predecessor, which first gave the Attorney General discretion to suspend deportation, indicates that section 244's purpose was to alleviate the onerous burden of numerous private bills. Representative Dies then stated:

It was my original thought that the way to handle all these meritorious cases was

through special bills. I am absolutely convinced as a result of what has occurred in this House that it is impossible to deal with the situation through special bills. We had a demonstration of that fact not long ago when 15 special bills were before the House. The House consumed 5½ hours considering four bills and made no disposition of any of these bills.

81 Cong.Rec. 5542 (1937). Congress' objective of reducing its private bill docket will not be frustrated by ruling section 244(c)(2) invalid; Congress will not now be required to entertain numerous private petitions.

Further, contrary to amici's assertions, section 244(a) operates independently of section 244(c)(2), thus buttressing our analysis of congressional intent. Section 244(a) states, in relevant part, that "[a]s hereinafter prescribed in this section, the Attorney General may, in his discretion, suspend deportation and adjust the status to that of an alien lawfully admitted for permanent residence [for all aliens meeting the provisions of either section 244(a)(1) or section 244(a)(2)]." Fairly read, this section gives the Attorney General the power to adjust the status of the alien. The section's first clause merely places conditions on the exercise of that discretion: subsection (c) and its mechanism of congressional disapproval is grouped with other provisions, some of which are plainly nonessential, regulating the Attorney General's discretion.[4] It is significant, and fatal to amici's argument, that section 244(a) stands independently of

---

Act. It reaffirmed *Champlin*: the severability of a statute turns on congressional intent. *See also Sloan v. Lemon,* 413 U.S. 825, 834, 93 S.Ct. 2982, 2987, 37 L.Ed.2d 939 (1973); *Tilton v. Richardson,* 403 U.S. 672, 683–84, 91 S.Ct. 2091, 2098, 29 L.Ed.2d 790 (1971) (plurality opinion); *Millstone v. O'Hanlon Reports, Inc.,* 528 F.2d 829, 832 n.3 (8th Cir. 1976); *Moore v. Fowinkle,* 512 F.2d 629, 632 (6th Cir. 1975). *Electric Bond* establishes a guide for ascertaining congressional intent. If Congress included a severability clause, it is presumed to have intended each section of the Act to stand or fall on its own.

**4.** Subsections (b) through (f) restrict the Attorney General's discretion in the following ways: subsection (b) limits the definition of continu-

ous physical presence; subsection (c) is the congressional disapproval mechanism; subsection (d) directs the Attorney General to adjust the nonpreference immigrant visas for each cancellation of deportation; subsection (e) grants to the Attorney General the discretion to allow deportable aliens to leave voluntarily if they meet specified conditions, and subsection (f) specifically exempts certain classes of aliens from the discretionary relief provided in subsection (a).

Each of these subsections seeks to limit the Attorney General's discretion, but this does not establish that each is somehow essential to Congress' purpose. From a reading of the section, and given the purpose of alleviating the number of cumbersome private bills, it is obvious that Congress enacted each subsection in

these latter conditions, and operates on its own terms. Section 244(c)(2) is properly understood as one of many conditions on the Attorney General's discretion; it is not, as amici urge, an essential condition on the delegation of that authority.[5]

We thus find that Chadha has indeed suffered injury in fact: the Attorney General will deport him should his challenge fail.[6] Further, Chadha can directly trace his deportation to the operation of section 244(c)(2). Thus, if section 244(c)(2)

---

order to further what it thought to be the proper handling of hardship cases; it is not evident that each subsection, and more particularly subsection (c), was absolutely necessary to the attainment of that goal.

5. *McCorkle v. United States*, 559 F.2d 1258 (4th Cir. 1977), which held that a one–house disapproval provision was inseparable from the rest of the Federal Salary Act of 1967, is thus distinguishable. The court in *McCorkle* construed a statute which, unlike the one at issue here, did not contain a severability clause. Thus, the burden was on McCorkle to show that the section he attacked was severable. Further, the court felt that the section under attack there was fairly essential to the attainment of Congress' purpose. *But see Atkins v. United States*, 556 F.2d 1028, 1083–89 (Ct.Cl.1977) (en banc) (Skelton, J., dissenting) (finding same section severable), *cert. denied*, 434 U.S. 1009, 98 S.Ct. 718, 54 L.Ed.2d 751 (1978). In *McCorkle* the court marshalled explicit statements from the legislative history that the bill would not be enacted without the one–house disapproval device. Here, by contrast, amici have not shown us any statements that the one–house disapproval mechanism is essential to the legislative purpose; indeed, they have led us to statements that the basic purpose was the lightening of Congress' workload. Against such a background, we cannot say that section 244(c)(2) was so essential to Congress' purpose that its invalidation will totally frustrate the statute's objective.

6. While this petition was pending, Chadha has married an American citizen. This makes him eligible for an immediate relative petition, INA §§ 201(b), 204, 8 U.S.C. §§ 1151(b), 1154 (1976), but such eligibility does not make the case moot. The Attorney General has declared an intention to deport Chadha; the marriage does not alter this intention. *Cf. New York Transit Auth. v. Beazer*, 440 U.S. 568, 580–81, 99 S.Ct. 1355, 1362, 59 L.Ed.2d 587 (1979) (statutory amendment arguably superseding challenged regulation does not render appeal moot when application and interpretation of amendment uncertain).

We note, moreover, that filing an immediate relative petition does not ensure certain and permanent relief. INA §§ 204, 205, 8 U.S.C. §§ 1154, 1155 (1976). *Compare Menezes v. INS*, 601 F.2d 1028 (9th cir. 1979) *with Dabaghian v. Civiletti*, 607 F.2d 868 (9th Cir. 1979). Thus, Chadha's marriage confers neither permanent resident status nor a guarantee thereof. Until an immediate relative petition is filed, Chadha remains subject to a final order of deportation. The dispute remains as a case or controversy.

Even if it were appropriate to assume, *arguendo*, that the INS would eventually grant Chadha's wife's petition–a petition which has not yet been, and may not be made–the case would not be moot. A case does not become moot during appeal so long as a party retains a personal stake in the appeal's outcome. *Powell v. McCormack*, 395 U.S. 486, 495–500, 89 S.Ct. 1944, 1950, 23 L.Ed.2d 491 (1969); *Jones v. Diamond*, 594 F.2d 997 (5th Cir. 1979); *McLaughlin v. Hoffman*, 547 F.2d 918 (5th Cir. 1977); *Carter–Wallace, Inc. v. Otte*, 474 F.2d 529, 532–34 (2d Cir. 1972) (Friendly, J.), *cert. denied*, 412 U.S. 929, 93 S.Ct. 2753, 37 L.Ed.2d 156 (1973). *See also Deposit Guaranty Nat'l Bank v. Roper*, 445 U.S. 326, 100 S.Ct. 2177, 64 L.Ed.2d 804 (1980) (disposition of litigant's substantive claim in class action suit does not destroy personal stake in outcome of class certification); *United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 100 S.Ct. 1202, 63 L.Ed.2d 479 (1980) (same). Chadha would suffer significant collateral detriment should we relegate him to the relief afforded by the immediate relative petition. The most obvious detriment is that he would be required to wait longer in order to be eligible for citizenship status. Under our disposition today, Chadha's status as a legal resident will have commenced when he received the initial grant of administrative suspension. Inasmuch as Chadha's deportation was suspended in 1974, the five–year waiting period for citizenship has already expired, thus making Chadha eligible to apply for naturalization. *See* 8 U.S.C. § 1427(a) (1976) (five–year period for citizenship). Under an immediate relative petition, however, Chadha could not gain permanent resident status until and unless that petition might be granted, and three more years would have to pass before Chadha might file for citizenship. *See* 8 U.S.C. § 1430(a) (1976). By this difference in dates when permanent resident status is granted, Chadha thus retains a personal interest in the disposition of this petition, even though an immediate relative petition may ostensibly grant similar relief. *Cf. Fiswick v. United States*, 329 U.S. 211, 222, 67 S.Ct. 224, 230, 91 L.Ed. 196 (1946) (appeal of conviction not rendered moot by petitioner's having served sentence because conviction may impede petitioner should he

is invalidated, the original suspension under section 244(a) will be reinstated and Chadha's status adjustment will become permanent. With this additional showing that "the judicial relief requested will ... redress the claimed injury," *Duke Power Co.*, 438 U.S. at 79, 98 S.Ct. at 2633, Chadha has made out an article III case or controversy.

Amici argue, however, that various prudential doctrines of standing preclude us from deciding Chadha's case. Specifically, they contend that Chadha asserts "a generalized grievance shared by a large number of citizens in a substantially equal measure," *Duke Power Co.*, 438 U.S. at 80, 98 S.Ct. at 2634; *United States v. Richardson*, 418 U.S. 166, 175, 94 S.Ct. 2940, 2945, 41 L.Ed.2d 678 (1974), and that his claim to relief impermissibly rests on "the legal rights or interests of third parties." *Duke Power Co.*, 438 U.S. at 80, 98 S.Ct. at 2634; *Warth v. Seldin*, 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). We reject both claims.

■ While it may be true that Chadha asserts a claim common to all citizens interested in separation of powers, it is true only in a trivial sense. He also has the added motive, crucial to a sharp presentation of the issues, of being injured by the operation of the statute he challenges. *See Warth v. Seldin*, 422 U.S. at 501, 95 S.Ct. at 2206. Since the Attorney General will deport Chadha pursuant to section 244(c)(2) unless we rule in Chadha's favor, it is easily seen that Chadha's claim "is not a generalized grievance. Instead ... it focuses on a particular [statute] and is not dependent on speculation about the possible actions of third parties not before the court." *Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 264, 97 S.Ct. 555, 562, 50 L.Ed.2d 450 (1977). Chadha's claim is thus specific and concrete: his injury stems directly from the operation of the statute he challenges. His injury presents the necessary "actionable causal relationship." *Id.*;

*Warth v. Seldin*, 422 U.S. 490, 507, 95 S.Ct. 2197, 2209, 45 L.Ed.2d 343 (1975). It is immaterial that his claim of section 244(c)(2)'s unconstitutionality is shared by many; he presents a specific instance of injury flowing directly from the statute's operation. In a separation of powers claim, this type of concrete injury is sufficient for standing purposes. *Buckley v. Valeo*, 424 U.S. 1, 12 n.10, 96 S.Ct. 612, 631 n.10, 46 L.Ed.2d 659 (1976) (per curiam).

■ Amici's third party standing claim fails for similar reasons. Amici claim that, by asserting invalidity under a separation of powers rubric, Chadha is actually asserting the rights of the Executive and Judicial branches. This argument, however, simply proves too much. If taken to its limit, no individual could ever challenge a congressional act using a separation of powers argument. Our constitutional history, however, is contrary. *See, e. g., Nixon v. Administrator of Gen. Servs.*, 433 U.S. 425, 441–43, 97 S.Ct. 2777, 2789, 53 L.Ed.2d 867 (1977); *Buckley v. Valeo*, 424 U.S. at 119–24, 96 S.Ct. at 682. Thus, by demonstrating a concrete injury–deportation–flowing from section 244(c)(2)'s operation, and by showing that this court could redress that injury, Chadha has established standing to challenge section 244(c)(2). *Buckley v. Valeo*, 424 U.S. at 12 n.10, 96 S.Ct. at 631 n.10; *Warth v. Seldin*, 422 U.S. at 501, 95 S.Ct. at 2206.

### 2. Political Question

■ Amici's next claim focuses not on Chadha's personal stake, but on the nature of his claim. Their contention is that Chadha's claim presents a nonjusticiable political question. At first glance, this argument may appear to have merit: the Naturalization Clause, U.S.Const. art. I, § 8, cl. 4, when read in conjunction with the Necessary and Proper Clause, U.S.Const. art. I, § 8, cl. 18, gives Congress considerable power over aliens. *See, e. g., Fiallo v. Bell*, 430

apply for naturalization). In addition, a case is not rendered moot simply because there is the bare possibility, or even probability, that the outcome of a separate administrative proceed-

ing may grant the litigant identical or similar relief. *Sierra Club v. Train*, 557 F.2d 485 (5th Cir. 1977); *Consumers Union v. Miller*, 84 F.R.D. 240 (D.D.C.1979).

U.S. 787, 792–95, 97 S.Ct. 1473, 1477, 52 L.Ed.2d 50 (1977). This discretion, while broad, is not unlimited. *See* L. Tribe, American Constitutional Law § 5–16, at 281–82 (1977). But Chadha's claim is not that Congress has violated either the Naturalization or the Necessary and Proper Clauses; his claim is that section 244(c)(2) violates the separation of powers doctrine. As this doctrine is not textually committed to any one branch, the political question doctrine is not implicated. *Powell v. McCormack*, 395 U.S. 486, 519–20, 89 S.Ct. 1944, 1962, 23 L.Ed.2d 491 (1969); *Baker v. Carr*, 369 U.S. 186, 217, 82 S.Ct. 691, 710, 7 L.Ed.2d 663 (1962). Indeed, courts have often adjudicated separation of powers claims. *See, e. g., Nixon v. Administrator of Gen. Servs.*, 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977); *Buckley v. Valeo*, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam); *Atkins v. United States*, 556 F.2d 1028 (Ct.Cl.1977) (per curiam) (en banc), *cert. denied*, 434 U.S. 1009, 98 S.Ct. 718, 54 L.Ed.2d 751 (1978).[7]

■ A more fundamental reason, however, underlies our conclusion that this case does not present a political question. The Supreme Court has explicitly recognized that the political question doctrine is based on a judicial recognition of the principle of separation of powers. *Gilligan v. Morgan*, 413 U.S. 1, 10–11, 93 S.Ct. 2440, 2445, 37 L.Ed.2d 407 (1973); *Powell v. McCormack*, 395 U.S. at 517, 89 S.Ct. at 1961. It would stand the political question doctrine on its head to require the Judiciary to defer to another branch's determination that its acts do not violate the separation of powers principle. It is the Judiciary's prerogative, after a showing that the source of a claimant's appeal is not textually committed to

another branch, to adjudicate a claimed excess by a coordinate branch of its constitutional powers. In this case, Chadha suffers injury due to the operation of a statute he claims violates the separation of powers principle. This type of claim is subject to judicially manageable standards, *see, e. g., Buckley v. Valeo*, 424 U.S. at 119–24, 96 S.Ct. at 682, and we therefore reject amici's claim.

**3. Adverseness**

■ Amici's final point is that Chadha's claim presently lacks the necessary adverseness. They argue that since the INS has agreed that section 244(c)(2) is unconstitutional, we should decline to pass on Chadha's case. This argument misconceives the adverseness requirement. The controversy "must be a real and substantial [one] admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 241, 57 S.Ct. 461, 464, 81 L.Ed. 617 (1937). Here, Chadha has asserted a concrete controversy, and our decision will have real meaning: if we rule for Chadha, he will not be deported; if we uphold section 244(c)(2), the INS will execute its order and deport him. Courts often, moreover, adjudicate disputes in which legal or factual matters are conceded.[8] In *Cheng Fan Kwok v. INS*, 392 U.S. 206, 210 n.9, 88 S.Ct. 1970, 1973 n.9, 20 L.Ed.2d 1037 (1968), for example, the INS also agreed with the alien's interpretation of the case's dispositive issue. Yet, the Court asked Congress to appear as amici, as we have done, and heard the case on the merits. Similarly, in *Atkins v. United*

7. *Fiallo v. Bell*, 430 U.S. 787, 97 S.Ct. 1473, 52 L.Ed.2d 50 (1977), is not contrary. There, a challenge was made to Congress' classification scheme for immigration preferences. The Court held that the petitioners' equal protection and due process claims were justiciable. *Id.* at 792 & 793 n.5, 97 S.Ct. at 1447 & 1448 n.5.

8. The Supreme Court has often recognized the presence of a case or controversy irrespective of a party's concessions. *See, e. g., Sibron v. New York*, 392 U.S. 40, 58, 88 S.Ct. 1889, 1900;

20 L.Ed.2d 917 (1968); *Levine v. United States*, 383 U.S. 265, 266, 86 S.Ct. 925, 15 L.Ed.2d 737 (1966); *Cates v. Haderlein*, 342 U.S. 804, 72 S.Ct. 47, 96 L.Ed. 609 (1951) (per curiam); *Young v. United States*, 315 U.S. 257, 258–59, 62 S.Ct. 510, 511, 86 L.Ed. 832 (1942). *See also Atkins v. United States*, 556 F.2d 1028, 1058 & n.15 (Ct.Cl.1977) (per curiam) (en banc), *cert. denied*, 434 U.S. 1009, 98 S.Ct. 718, 54 L.Ed.2d 751 (1978).

*States*, 556 F.2d at 1058 & n.15, the Justice Department agreed with the plaintiffs that a one–house disapproval mechanism was unconstitutional. The Court of Claims, however, heard the case on the merits after requesting both houses of Congress to appear as amici. *Id.*

Finally, if we accepted amici's argument and dismissed the appeal for lack of adversity, we would implicitly approve the untenable result that all agencies could insulate unconstitutional orders and procedures from appellate review simply by agreeing that what they did was unconstitutional. Where, as here, the agency fully intends to enforce its order, it would be a perversion of the judicial process to dismiss the appeal and thereby permit the order to be enforced on such grounds.[9]

Against this background, and with arguments for the constitutionality of the statute ably advanced by amici, we find that the issues are presented in a sufficiently concrete and specific manner for us to reach the merits of the case.

## II. Merits

### A. *Separation of Powers as a Legal Standard*

 Executive or legislative actions which contravene the principle of separation of powers are unconstitutional. *Nixon v. Administrator of Gen. Servs.*, 433 U.S. 425, 441–46, 97 S.Ct. 2777, 2789, 53 L.Ed.2d 867 (1977); *Buckley v. Valeo*, 424 U.S. 1, 118–24, 96 S.Ct. 612, 681–84, 46 L.Ed.2d 659 (1976) (per curiam); *United States v. Nixon*, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952); *Humphrey's Executor v. United States*, 295 U.S. 602, 55 S.Ct. 869, 79 L.Ed. 1611 (1935). We conclude the statutory mechanism reviewed here violates the constitutional doctrine of separation because it is a prohibited legislative intrusion upon the Executive and Judicial branches.

We explain in detail our reasons for that conclusion, but preface our discussion by a consideration of some elementary principles. This is necessary because no circuit or Supreme Court authority we have found[10] holds that the Legislature has impermissibly invaded the prerogative of the Executive or the Judiciary absent a clause in the Constitution which confers the power upon another branch with great specificity.[11] Given this background, the gravity of our conclusion requires us to consider the pertinent first principles of the Constitution in detail.

The most recent Supreme Court case declaring that a legislative action violated the separation of powers doctrine was *Buckley v. Valeo*. The Supreme Court there restated the separation of powers doctrine as a rule of general application, but found also

---

**9.** Amici argue for the absence of a case or controversy because they cannot petition the Supreme Court for a writ of certiorari. *See Ex parte Leaf Tobacco Board*, 222 U.S. 578, 581, 32 S.Ct. 833, 56 L.Ed. 323 (1911). In *United States v. Lovett*, 328 U.S. 303, 66 S.Ct. 1073, 90 L.Ed. 1252 (1946), however, a congressional act was also challenged. There, the Solicitor General conceded two of the three issues and expressed no opinion on the third. *Id.* at 305, 66 S.Ct. at 1073. Congress then authorized a special prosecutor to petition for a writ of certiorari. *Id.* at 306, 66 S.Ct. at 1074. The Supreme Court found the requisite case or controversy was not absent and heard the case on the merits.

**10.** *Cf. Atkins v. United States*, 556 F.2d 1028 (Ct.Cl.1977) (per curiam) (en banc) (legislative disapproval device in federal salary statute constitutional), *cert. denied*, 434 U.S. 1009, 98 S.Ct. 718, 54 L.Ed.2d 751 (1978); *State v. A. L.*

*I. V. E. Voluntary*, 606 P.2d 769 (Alas. 1980) (legislative veto violates state constitution). For a balanced and comprehensive discussion of the problem of which this case presents one facet, see Dixon, *The Congressional Veto and Separation of Powers: The Executive on a Leash?* 56 N.C.L.Rev. 455 (1978), and McGowan, *Congress, Court, and Control of Delegated Power*, 77 Colum.L.Rev. 1119, 1133–62 (1977). Many other academic essays, too numerous to list here, are cited in Henry, *The Legislative Veto: In Search of Constitutional Limits*, 16 Harv.J.Legis. 735, 737 n.7 (1979); various authors there cited are affiliated with one side or another in the debate on the legislative veto.

**11.** The allocation of powers among the three branches is general in its terms but comprises an explicit textual recognition of the separation of powers principle. *See* U.S.Const., art. I, § 1, cl. 1; *id.*, art. II, § 1, cl. 1; *id.*, art. III, § 1, cl. 1.

that the statute in question violated the explicit constitutional provision that comprises the appointment power, U.S.Const., art. I, § 2, cl. 2. *See also Myers v. United States*, 272 U.S. 52, 47 S.Ct. 21, 71 L.Ed. 160 (1926). In this case the concern is whether the legislature has undertaken to exercise a power necessarily but implicitly conferred elsewhere by the nature of an institutional government: power such as the executive authority faithfully to execute the laws, U.S.Const., art. II, § 3, and the judicial power to determine cases or controversies, *id.*, art. III, § 2. To support our conclusion that this statute violates the rule of separation of powers by usurping a necessary power of another branch, we must examine the purpose and function of the constitutional doctrine, particularly as it pertains to the boundaries of legislative authority.

The Supreme Court has placed it beyond dispute that the doctrine of separation of powers is vital for constitutional government. *See Nixon v. Administrator of Gen. Servs.*, 433 U.S. 425, 441–46, 97 S.Ct. 2777, 2789–91, 53 L.Ed.2d 867 (1977); *id.* at 491–92, 97 S.Ct. at 2813 (Blackmun, J., concurring in part and concurring in the judgment); *id.* at 492–504, 97 S.Ct. at 2813–2820 (Powell, J., concurring in part and concurring in the judgment); *id.* at 504–20, 97 S.Ct. at 2820–29 (Burger, C.J., dissenting); *id.* at 545–61, 97 S.Ct. at 2841–49 (Rehnquist, J., dissenting); *Buckley v. Valeo*, 424 U.S. 1, 118–24, 96 S.Ct. 612, 681–84, 46 L.Ed.2d 659 (1976) (per curiam); *id.* at 284–86, 96 S.Ct. at 757–58 (White, J., concurring in part and dissenting in part). As James Madison affirmed in the beginning, the separation of powers concept is neither doctrinaire nor rigid.[12] In part for that reason, the Court's specific discussions of the principle's meaning are a cautious balance of antinomies.

[A]ll of the courts which have addressed themselves to the matter start on common ground in the recognition of the intent of the Framers that the powers of the three great branches of the National Government be largely separate from one another.

Yet it is also clear ... that the Constitution by no means contemplates total separation of each of these three essential branches of Government .... The men who met in Philadelphia in the summer of 1787 were practical statesmen, experienced in politics, who viewed the principle of separation of powers as a vital check against tyranny. But they likewise saw that a hermetic sealing off of the three branches of Government from one another would preclude the establishment of a Nation capable of governing itself effectively.

*Buckley*, 424 U.S. at 120–21, 96 S.Ct. at 682–83. The doctrine is at once pervasive and fluid, and of necessity there will be instances where the proper means for its

---

**12.** The accumulation of all powers legislative, executive and judiciary in the same hands, whether of one, a few or many, and whether hereditary, self appointed, or elective, may justly be pronounced the very definition of tyranny. Were the federal constitution therefore really chargeable with this accumulation of power or with a mixture of powers having a dangerous tendency to such an accumulation, no further arguments would be necessary to inspire a universal reprobation of the system. I persuade myself however, that it will be made apparent to every one, that the charge cannot be supported, and that the maxim on which it relies, has been totally misconceived and misapplied. In order to form correct ideas on this important subject, it will be proper to investigate the sense, in which the preservation of liberty requires, that the three great departments of power should be separate and distinct.

From these facts by which Montesquieu was guided it may clearly be inferred, that in saying "there can be no liberty where the legislative and executive powers are united in the same person, or body of magistrates," or "if the power of judging be not separated from the legislative and executive powers," he did not mean that these departments ought to have no *partial agency* in, or no *controul* over the acts of each other. His meaning, as his own words import, and still more conclusively as illustrated by the example in his eye, can amount to no more than this, that where the *whole* power of one department is exercised by the same hands which possess the *whole* power of another department, the fundamental principles of a free constitution, are subverted.

The Federalist No. 47 (J. Madison) at 324–26 (J. Cooke ed. 1961).

enforcement rest with the mutual respect that each branch of the Government must extend to the others. At one end of the continuum the doctrine is a self–enforcing rule, one of political comity. There remain, nevertheless, cases in which transgressions are more patent. In these instances it is the duty of the Judicial Branch to resolve disputes with or among the other component parts of the Government. *Youngstown Sheet & Tube Co. v. Sawyer; Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803). This is true both in those cases in which the affected branches have taken a position in the precise dispute before the court, *see, e. g., Nixon v. Administrator of Gen. Servs.; Buckley v. Valeo*, and those in which a private litigant is, in part, a surrogate for a branch whose powers have been usurped, *see, e. g., Youngstown Sheet & Tube Co. v. Sawyer*. In the latter case, the private person also asserts a separate and personal legal interest, namely, that the exercise of governmental power exceeds constitutional bounds and is therefore an unlawful invasion of individual rights. Chadha's case falls into this last category.

■ An explanation of the purposes and dynamics of the separation of powers rule will assist in understanding the standard we formulate for its application. Although an exhaustive historical study of the doctrine is not practical here,[13] two principal purposes can be identified. The doctrine's first purpose is to prevent an unnecessary and therefore dangerous concentration of power in one branch. Thomas Jefferson wrote that the basis of all free governments was that "the powers of government should be so divided and balanced among several bodies of magistracy, as that no one could transcend their legal limits, without being effectually checked and restrained by the others."[14] James Madison and Justice Brandeis have written notable formulations of this theory:

> This policy of supplying by opposite and rival interests, the defect of better motives, might be traced through the whole system of human affairs, private as well as public. We see it particularly displayed in all the subordinate distributions of power; where the constant aim is to divide and arrange the several offices in such a manner as that each may be a check on the other; that the private interest of every individual, may be a centinel over the public rights. These inventions of prudence cannot be less requisite in the distribution of the supreme powers of the state.

The Federalist No. 51 (J. Madison) at 349 (J. Cooke ed. 1961).

> The doctrine of the separation of powers was adopted by the Convention of 1787, not to promote efficiency but to preclude the exercise of arbitrary power. The purpose was, not to avoid friction, but, by means of the inevitable friction incident to the distribution of the governmental powers among three departments, to save the people from autocracy.

*Myers v. United States*, 272 U.S. 52, 293, 47 S.Ct. 21, 85, 71 L.Ed. 160 (1926) (Brandeis, J., dissenting).[15] In addition, there is respected contemporary support for this historical interpretation. *See, e. g.,* G. Wood, The Creation of the American Republic 1776–1787, at 150–61, 446–53, 547–53, 602–06, 608 (Norton ed. 1972).

The goal of preventing undue concentrations of power is furthered by the natural

---

**13.** The following provide historical background on the separation of powers doctrine: Legislative Reference Service of the Library of Congress, Separation of Powers and the Independent Agencies: Cases and Selected Readings, Prepared for the Subcomm. on Separation of Powers of the Senate Comm. on the Judiciary, S. Doc. 91–49, 91st Cong., 1st Sess. (1969); G. Wood, The Creation of the American Republic 1776–1787, at 150–61, 446–53, 547–53, 602–06, 608 (Norton ed. 1972); Parker, *The Historic Basis of Administrative Law: Separation of Powers and Judicial Supremacy*, 12 Rutgers L.Rev. 449 (1958); Sharp, *The Classical American Doctrine of "The Separation of Powers,"* 2 U.Chi.L.Rev. 385 (1935); Wright, *The Origins of the Separation of Powers in America*, 13 Economica 169 (1933).

**14.** T. Jefferson, Notes on the State of Virginia 120 (W. Peden ed. 1955).

**15.** *See also* Sharp, *supra* note 13, at 407.

tendency of each center of power to compete to enlarge or maintain its own influence. The net effect is to deter any one branch from attaining hegemony. An undue concentration of authority in one branch inevitably causes structural decomposition of the other branches, along with a dispersion of their original powers. This idea preceded the revolution and is found in Blackstone's discussion of Parliament:

> In all tyrannical governments the supreme magistracy, or the right both of *making* and of *enforcing* the laws, is vested in one and the same man, or one and the same body of men; and wherever these two powers are united together there can be no public liberty. The magistrate may enact tyrannical laws, and execute them in a tyrannical manner, since he is possessed, in quality of dispenser of justice, with all the power which he, as legislator, thinks proper to give himself. But where the legislative and executive authority are in distinct hands, the former will take care not to intrust the latter with so large a power as may tend to the subversion of its own independence, and therewith of the liberty of the subject. With us, therefore, in England, this supreme power is divided into two branches; the one legislative, to wit, the Parliament, consisting of king, lords, and commons; the other executive, consisting of the king alone.

1 W. Blackstone, Commentaries * 146–47. *See also id.* at * 269–70 (discussion of executive and judicial powers). If the doctrine is given this competitive cast, it might be implied that the proper remedy for a violation lies in the branch encroached upon. Under this view one could argue that an executive agency can defy an attempt by another branch to exercise a prerogative of the former.[16] Even from the standpoint of abstract logic, however, this solution is not sound because stalemate is the end result, and certainly our constitutional tradition is otherwise. In the most sensitive of cases the Judiciary has adjudicated competing

claims and the affected branch has complied. *See United States v. Nixon; Youngstown Sheet & Tube Co. v. Sawyer; Humphrey's Executor. Cf. Ex parte Merryman*, 17 Fed.Cas. 144 (C.C.D.Md.1861) (writ of habeas corpus suspended in wartime).

█ The framers had a second motive for adopting the principle of separation of powers. The doctrine serves also as a practical measure to facilitate administration of a large nation by the assignment of numerous labors to designated authorities. Thomas Jefferson made this point in some detail:

> I think it very material to separate in the hands of Congress the Executive & Legislative powers, as the Judiciary already are in some degree. This I hope will be done. The want of it has been the source of more evil than we have experienced from any other cause. Nothing is so embarrassing nor so mischievous in a great assembly as the details of execution. The smallest trifle of that kind occupies as long as the most important act of legislation, & takes place of everything else. Let any man recollect, or look over, the files of Congress, he will observe the most important propositions hanging over from week to week & month to month, till the occasions have past them, & the thing never done. I have ever viewed the executive details as the greatest cause of evil to us, because they in fact place us as if we had no federal head, by diverting the attention of that head from great to small objects.

4 T. Jefferson, The Writings of Thomas Jefferson 424–25 (P. Ford ed. 1894) (Letter to E. Carrington, Aug. 4, 1787).

There are two respects in which the separation of powers doctrine enhances the responsible autonomy of each branch and thereby the efficiency of the government as a whole. The doctrine protects the Legislative branch, for example, from cumbersome entanglement in the myriad instances of execution of its laws and policy. Certain

---

**16.** *See, e. g.,* Hearings Before the Subcomm. on Elementary, Secondary, & Vocational Educ. of the House Comm. on Educ. & Labor, 96th

Cong., 2d Sess. (Sept. 18, 1980) (regarding Secretary of Education's disregard of legislative disapproval).

efficiencies of administration can be achieved, moreover, only by a distribution of the government's powers.[17] The concern for the autonomy of each branch is shown by a corollary of the separation doctrine, namely, the rule against undue delegation of powers. Just as the separation of powers prohibits the accumulation of too much power in one branch, the nondelegation doctrine prevents one branch from abrogating its authority in a wholesale and standardless manner.[18]

Courts cannot, however, parse every allocation of power under the separation doctrine. We are not the ideal arbiters of efficient administration in many instances because we are not constituted to choose and to apply optimal theories of political and organizational science applicable to the routine operation of the Government. An examination of the many instances in which strict separation is not observed, cases both actual and conceivable, shows at one extreme a mere tinkering with the balance, of limited scope or temporal duration, growing out of a great practical necessity, and presenting a realistic threat neither to individual liberty nor to the orderly functioning of a coordinate branch. An example approved in the case law is the congressional prerogative to grant standing to persons otherwise barred by internal prudential rules developed by the courts to govern litigation before them. *See, e. g., Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975).

There are, nevertheless, other instances in which judicial action is required to correct constitutional violations. In contrast to temporary, necessary, and minor departures from the norm, there are departures that are axiomatically unconstitutional, departures which undermine both the purpose mutually to check component powers and that to promote government efficiency. Examples would be an attempt by the Executive to enact a federal criminal code without congressional approval, or an attempt by Congress to exercise the prosecutorial and adjudicative responsibilities of enforcing the criminal law. No doubt all would agree that these schemes would violate the Constitution.[19]

In the amorphous expanse between these poles, however, there will be certain accom-

---

**17.** *See, e. g.*, Miller, *An Inquiry into the Relevance of the Intentions of the Founding Fathers, With Special Emphasis Upon the Doctrine of Separation of Powers*, 27 Ark.L.Rev. 583, 587 (1973).

**18.** For discussion of the relation between the principles of separation of powers and of nondelegation, see L. Jaffe, Judicial Control of Administrative Action 28–86 (1965); McGowan, *supra* note 10; note 33 *infra* (relation between nondelegation rule and permissible extent of shared administration).

**19.** John Adams described the havoc such a scheme would wreak:

The next inquiry is, concerning the administration of justice. Shall every criminal be brought before this assembly and tried? Shall he be there accused before five hundred men? witnesses introduced, counsel heard? This again would take more than the whole year; and no man, after all, would consider his life, liberty, or property, safe in such a tribunal. These all depend upon the disquisitions of the counsel, the knowledge of the law in the judges, the confrontation of parties and witnesses, the forms of proceedings, by which the facts and the law are fairly stated before the jury for their decision, the rules of evidence, by which the attention of the jury is confined to proper points, and the artifices of parties and counsel avoided. An assembly of five hundred men are totally incapable of this order, as well as knowledge . . . .

Will it be said that the assembly shall appoint committees to try causes? But who are to make these appointments? Will not a few haughty palatines in the assembly have influence enough to determine the election in favor of their friends? and will not this make the judges the tools of a party? If the leaders are divided into parties, will not one prevail at one year, and another the next? and will not this introduce the most wretched of servitudes, an uncertain jurisprudence?

1 J. Adams, A Defence of the Constitutions of Government of the United States of America 375–76 (London ed. 1794), *reprinted in* 4 J. Adams, Works of John Adams 583–84 (C. Adams ed. 1851). *See generally*, L. Jaffe, Judicial Control of Administrative Action 28–33 (1965). For a discussion of the distinction between essential and incident powers in a similar context, see Van Alstyne, *The Role of Congress in Determining Incidental Powers of the President and of the Federal Courts: A Comment on the Horizontal Effect of the Sweeping Clause*, 40 Law & Contemp.Prob. 102 (Spring 1976).

modations not admitting of judicial arbitration because the only considerations are ones of organization not implicating a suspect form or degree of power. It follows from the various practical purposes served· by the principle that separation of powers is not an inflexible rule, but one that governs a broad continuum of the various admixtures of powers, some permissible. As Mr. Justice Jackson stated: "While the Constitution diffuses power the better to secure liberty, it also contemplates that practice will integrate the dispersed powers into a workable government. It enjoins upon its branches separateness but interdependence, autonomy but reciprocity." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. at 635, 72 S.Ct. at 870 (Jackson, J., concurring). Consonant with that view, the courts interpret separation of powers questions pragmatically, in order to preserve the essential design of the Constitution without imposing unworkable limitations.[20] We must acknowledge in this regard the primacy of the Legislative branch in organizing the Government as evidenced by its constitutional right to create positions in the Executive branch, U.S.Const., art. II, § 2, cl. 2, and to create the structure of the courts, *id.*, art. I, § 8, cl. 9. Professor, later Justice, Frankfurter, explained this point.

> The accommodations among the three branches of the government are not automatic. They are undefined, and in the very nature of things could not have been defined, by the Constitution. To speak of *lines* of demarcation is to use an inapt figure. There are vast stretches of ambiguous territory. Certainly in the first instance Congress must mark metes and bounds.[21]

In response, it must further be acknowledged that the existence of "vast stretches of ambiguous territory" does not preclude the existence of other zones of power that are judicially ascertainable. These latter instances, in which the arrogation of excess and unwonted power is radical and unambiguous, comprise the occasions when a court must act to maintain the constitutional design.

■ We come then to define the judicial standard governing whether an attempted exercise of authority by one branch contravenes the rule of separation of powers. The twin purposes of preventing concentrations of power dangerous to liberty and of promoting governmental efficiency are served if we define a constitutional violation of the separation of powers as an assumption by one branch of, powers that are central or essential to the operation of a coordinate branch, provided also that the assumption disrupts the coordinate branch in the performance of its duties and is unnecessary to implement a legitimate policy of the Government. *See Nixon v. Administrator of Gen. Servs.*, 433 U.S. 425, 443, 97 S.Ct. 2777, 2790, 53 L.Ed.2d 867 (1977). If an exercise of functions which lie at the center of another branch is attempted on a long–term and routine basis, a violation of the constitutional rule requiring separation of powers is more easily established. Before we determine whether the congressional disapproval device here reviewed violates the standard we have set forth, it is necessary to examine in detail the statutory duties Congress has required the Executive and Judiciary to perform.

### B. The Process for Suspension of Deportation

Until 1940 deportation of aliens illegally within the United States was mandatory. The strict rule produced harsh results in many cases. Hardships were exacerbated after the adoption in 1924 of permanent numerical restrictions on immigrations and

---

**20.** This does not mean that "we are dealing with ... a 'political doctrine,' and not a technical rule of law." Frankfurter & Landis, *Power of Congress over Procedure in Criminal Contempts in "Inferior" Federal Courts–A Study in Separation of Powers*, 37 Harv.L.Rev. 1010, 1014 (1924) (footnote omitted). If this were true, all statutory alterations of a hypothetical norm of allocated powers might be unassailable, absent an explicit constitutional limitation in the particular power involved. We do not think the doctrine is quite so fluid.

**21.** Frankfurter & Landis, *supra* note 20, at 1016.

the repeal of statutes of limitation for the deportation of those who had entered the United States illegally.[22] The suffering caused by these laws led to urgent requests for reform. Congress responded to these requests by passing the Alien Registration Act of 1940, ch. 439, 54 Stat. 670 (1940). The Act authorized the Attorney General to suspend deportation in certain categories on grounds of extreme hardship. The Attorney General was required to report each suspension to Congress, which reserved the right to disapprove suspension by a vote of both House and Senate. In 1952 the Congress enacted the Immigration and Nationality Act (INA).[23] In section 244(c)(2) the Congress provided that either house acting alone could override the Attorney General's suspension of deportation.

The INA entitles an alien to a hearing on whether he is deportable. During this hearing, an alien "may apply to the special inquiry officer for suspension of deportation under section 244(a) of the Act [8 U.S.C. § 1254(a) (1976)]," 8 C.F.R. § 242.-17(a) (1979); upon completion of the necessary forms, the inquiry officer receives evidence on the issues of grounds for deportability and for suspension. *Id.* § 244.1; 2 C. Gordon & H. Rosenfield, Immigration Law and Procedure, §§ 7.9a(5), 7.9d(4), 7.9f (rev. ed. 1980). If granted, the suspension allows the Attorney General eventually to "adjust the status to that of an alien lawfully ad-

mitted for permanent residence," 8 U.S.C. § 1254 (1976). The suspension proceeding "has two phases: a determination whether the statutory conditions have been met, which generally involves a question of law, and a determination whether relief shall be granted, which [ultimately] . . . is confided to the sound discretion of the Attorney General [and his delegates]." 2 C. Gordon & H. Rosenfield, *supra*, § 7.9a(5), at 7–134.[24]

At this point, there are subclassifications for aliens, depending on the grounds for their deportability. These do not concern us. For our purposes of sketching the statutory scheme, it is important to note the following principal statutory prerequisites which, if met, entitle an alien to be considered for the discretionary grant of suspension: period of residence in the United States, good moral character, and hardship. *See* INA § 244(a), 8 U.S.C. § 1254(a) (1976); 2 C. Gordon & H. Rosenfield, *supra*, at § 7.9d(2), (3), (5). Each of these prerequisites requires a legal determination of a traditional sort, the contents of which are explicated by an orderly history of administrative practice and judicial review and interpretation.[25] Unlike the burden on the issue of deportability, the onus is on the alien to demonstrate satisfaction of the statutory criteria.

The burden is also on the alien to demonstrate the existence of such substantial eq-

---

**22.** Immigration Act of 1924, ch. 190, 43 Stat. 153 (1924).

**23.** Immigration and Nationality Act, ch. 477, 66 Stat. 163 (1952). Although President Truman vetoed the Act, his veto message did not specifically focus on the one–house disapproval provision of section 244(c)(2). However, the Report of the President's Commission on Immigration and Naturalization, Whom We Shall Welcome 213–14 (1953), expressed the view that that provision "is contrary to our fundamental constitutional doctrine of separation of legislative, executive, and judicial powers. [...] [It] is obstructive of good government and destructive of fundamental principles. In immigration matters, in particular, it frustrates proper administration and puts a premium on extraneous considerations in the determination of legal rights."

**24.** The legal, as opposed to discretionary, nature of the determination of statutory eligibility

may be different in the context of a petition to reopen suspension of deportation. *See, e. g., Wang v. INS*, 622 F.2d 1341 (9th Cir. 1980) (en banc), *petition for cert. filed*, 49 U.S.L.W. 3271 (U.S. Sept. 25, 1980) (No. 80–485).

**25.** For example, the Board of Immigration Appeals, a nonstatutory adjunct to the Attorney General's role in this scheme, has applied these specific criteria for determining whether the statutory prerequisite of hardship has been met by the alien: length of residence and family ties in the United States, the possibility of an alien's obtaining a visa abroad, and the possible weight of the burden of deportation on the alien's health, age, and finances. In re S., 5 I. & N. Dec. 409 (1953); In re U., 5 I. & N. Dec. 413 (1953). *See* 2 C. Gordon & H. Rosenfield, Immigration Law and Procedure § 7.9d(5), at 7–161 to 7–165 (rev. ed. 1980).

uities, above and beyond the statutory prerequisites, as should persuade the inquiry officer and the Attorney General to make the second and discretionary determination to suspend deportation. While such equities are less clearly limned by precedent than the factors governing the first half of the decision, they can be described simply and fairly as facts establishing an unusually strong showing on the first half of the decision, e. g., extraordinary hardship or moral character, or evidence of such a meritorious record as a member of the community as would make the alien a desirable potential citizen. *Id.* § 7.9e, at 7–165 to 7–170.

If these two hurdles, the satisfaction of statutory prerequisites and a favorable exercise of discretion, are cleared, a third and final one awaits. It is the one–house disapproval mechanism, described as follows:

> Reports of favorable action in suspension cases received by Congress from the Attorney General are referred to the Judiciary Committees of each House of Congress. Each committee has a staff which studies the Attorney General's report and recommends any further action that may be warranted. By agreement between the two Judiciary Committees all suspension cases are considered in the first instance by the Senate Judiciary Committee and if approved there and by the Senate (when affirmative approval is necessary) are then considered by the House Judiciary Committee. One commentator has said: "In practice, the consideration by Congress of the suspension is perfunctory and without debate, with Congressmen apparently content to rely on the recommendations of the judiciary committees, which in turn rely upon the views of their immigration subcommittees."

An attorney representing the subject of a suspension of deportation referred to Congress by the Attorney General may discuss his client's case with the staff of the Judiciary Committee in which it is being considered. Usually he will be giv-

en an opportunity to present the alien's full story and to submit any new oral or written evidence, preferably accompanied by documentary proof.

> After submission of the case by the Attorney General, Congress can take action during the current session and until close of its following session.
>
> ... Two procedures are prescribed for Congressional approval. In cases under the first category of § 244 the Attorney General's action is ratified unless either House of Congress passes a resolution of disapproval.
>
> ... In the vast majority of cases the Attorney General's grant of suspension is approved by Congress in the manner prescribed....

*Id.* § 7.9f, at 7–174 to 7–176 (footnotes omitted).

The substantive elements governing the suspension decision cannot be understood fully without considering the elements of standard procedure and review that constitute a final decision. Therefore, we describe the administrative procedure and judicial review mechanisms that govern section 244 proceedings until the point of congressional action.

The procedural requirements applicable to both the eligibility and discretionary parts of the suspension of deportation decision have varied over time. It is a process that has sometimes seemed nearly free of procedural restraints but which has gradually been channeled into the clearer and more regular mainstreams of administrative procedure. Although the Supreme Court held in 1950 that the requirements of the Administrative Procedure Act (APA) applied to deportation proceedings, *Wong Yang Sung v. McGrath*, 339 U.S. 33, 70 S.Ct. 445, 94 L.Ed. 616 (1950), five years later the Court held that intervening legislation was intended to exempt these proceedings from the APA's coverage by the provision of special procedures, *Marcello v. Bonds*, 349 U.S. 302, 305–11, 75 S.Ct. 757, 759–62, 99 L.Ed. 1107 (1955).[26] By regula-

---

**26.** For analysis of the application of *Marcello* to discretionary relief for deportable aliens, see

*Giambanco v. INS*, 531 F.2d 141 (3d Cir. 1976); *Cisternas–Estay v. INS*, 531 F.2d 155 (3d Cir.),

tion, the Attorney General has provided procedural safeguards that include the opportunity to present evidence with respect to discretionary relief and a statement of reasons for granting or denying relief. 8 C.F.R. §§ 242.17(a), 242.18(a) (1979). Even in the very limited circumstances when confidential information may be considered by the hearing officer,[27] the general nature of this information must be disclosed so that the alien may present contrary evidence. *Id.* § 242.17(a) (1979). Deportation procedures are generally consonant with the requirements of due process as set out in the APA. *Marcello v. Bonds*, 349 U.S. at 307–10, 75 S.Ct. at 760–61.

These procedural requirements are more fully understood in light of the standard of review applied to the record developed during the administrative proceeding,[28] and this underscores why these proceedings, in their form and their impact on individuals, incorporate significant elements of adjudication. Although judicial review of denials of suspension is governed by section 106(a) of the Act, 8 U.S.C. § 1105a(a) (1976), rather than the APA, the legislative history of section 106 indicates that the bill was intended to "implement and apply" section 10 of the APA. H.R.Rep.No.1086, 87th Cong., 1st Sess. 22 (1961), *reprinted in* [1961] U.S. Code Cong. & Ad.News 2950, 2966. The Department of Justice explained that

adoption of section 106(a) would permit "[a]liens seeking review of administrative orders [to] be given full and fair opportunity to do so...." Letter of Apr. 18, 1961, from B. White, Dep.Atty.Gen., to House Comm. on the Judiciary, *id.* at 24, *reprinted in* [1961] U.S.Code Cong. & Ad.News 2968.[29] Judge Friendly has given the following explication of the courts' role in the section 244 scheme:

Disposition of the petition requires analysis of the scope of review of orders denying suspension of deportation. There is no reason to doubt that administrative findings of fact made in determining an alien's eligibility for suspension must meet the statutory test of support by "reasonable, substantial, and probative evidence on the record considered as a whole," § 106(a)(4), see *Foti v. Immigration and Naturalization Service*, 375 U.S. 217, 228–229 & n.15 [84 S.Ct. 306, 313 & n.15, 11 L.Ed.2d 281] (1963), or that a determination of ineligibility is subject to judicial scrutiny for proper application of the conditions prescribed in § 244. See *Dessalernos v. Savoretti*, 356 U.S. 269 [78 S.Ct. 690, 2 L.Ed.2d 751] (1958); *Wadman v. Immigration and Naturalization Service*, 329 F.2d 812 (9 Cir. 1964); *Gagliano v. Immigration and Naturalization Service*, 353 F.2d 922 (2 Cir. 1965). We can

*cert. denied*, 429 U.S. 853, 97 S.Ct. 145, 50 L.Ed.2d 127 (1976); Note, 8 Seton Hall L.Rev. 250 (1977).

**27.** Although the Supreme Court has permitted consideration of confidential information in a narrow category of cases in which disclosure would threaten the national security, *see Jay v. Boyd*, 351 U.S. 345, 76 S.Ct. 919, 100 L.Ed. 1242 (1956), this practice has been discontinued. 2 C. Gordon & H. Rosenfield, *supra* note 25, at § 7.9f(2).

**28.** There is some apparent confusion on this point. Even within this circuit, the formulation of the degree of reasonableness a denial of relief under section 244 must contain for affirmance by the Court of Appeals has ranged from no abuse of discretion, *Banks v. INS*, 594 F.2d 760, 762 (9th Cir. 1979), to substantial evidence, *Martin–Mendoza v. INS*, 499 F.2d 918, 920 (9th Cir. 1974), *cert. denied*, 419 U.S.

1113, 95 S.Ct. 789, 42 L.Ed.2d 810 (1975). The apparent inconsistencies are doubtless due to a conflation of the Attorney General's legal decision on eligibility with his discretionary determination to grant relief to aliens in the eligible class.

**29.** "Section 5 of this legislation establishes a judicial review proceeding precisely as is contemplated by the Administrative Procedure Act." H.R.Rep.No.1086, 87th Cong., 1st Sess. 27 (1961), *reprinted in* [1961] U.S.Code Cong. & Ad.News 2971.

Since deportation proceedings deal with the liberty of persons rather than mere property, the committee has concluded that granting an initial review in an appellate court gives the alien greater rights, greater security, and more assurance of a close study of his case by experienced judges.

*Id.* at 28, *reprinted in* [1961] U.S.Code Cong. & Ad.News 2972.

narrow the problem further by accepting that factual findings on which a discretionary denial of suspension is predicated must pass the substantial evidence test. The issue concerns the standard to be applied in reviewing an ultimate refusal to exercise discretion in favor of an eligible alien when the facts are undisputed or have been properly found.

. . . .

Without essaying comprehensive definition, we think the denial of suspension to an eligible alien would be an abuse of discretion if it were made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis such as an invidious discrimination against a particular race or group, or, in Judge Learned Hand's words, on other "considerations that Congress could not have intended to make relevant." *United States ex rel. Kaloudis v. Shaughnessy*, supra, 180 F.2d [489] at 491.

*Wong Wing Hang v. INS*, 360 F.2d 715, 716, 719 (2d Cir. 1966) (Friendly, J.). It is clear that courts will treat section 244's statutory criteria for eligibility like any other statutory prerequisites, and reverse when they have been misapplied. *See, e. g., Prapavat v. INS*, 638 F.2d 87 (9th Cir. 1980); *Bastidas v. INS*, 609 F.2d 101 (3d Cir. 1979); *So Chun Chung v. INS*, 602 F. 2d 608 (3d Cir. 1979); *Rassano v. INS*, 492 F.2d 220 (7th Cir. 1974); *Siang Ken Wang v. INS*, 413 F.2d 286 (9th Cir. 1969); *Git Foo Wong v. INS*, 358 F.2d 151 (9th Cir. 1966).

In fine, our detailed examination of the section 244 statutory scheme for suspension of deportation leads us to the following capsule description. Section 244 establishes criteria for a government dispensation, criteria applied by the administrative agency in an ongoing program of individual adjudicative-type determinations. Although the ultimate determination is discretionary, a fair consistency in the treatment of aliens is guaranteed, up to the point of review by Congress, by appropriate procedural safeguards. These procedures are, in turn, en-

forced by judicial review of various substantive and procedural aspects of the Attorney General's decision, in both its legal and discretionary phases. Finally, in cases where relief is granted, there is congressional review of the application of both the statutory and equitable criteria as they have been developed and applied by administrative and judicial interpretation. It is this last step we turn to now.

## C. The Legislative Disapproval as a Constitutional Violation

Chadha's case presents the question whether the one-house disapproval disrupts an essential function of the judicial office or of the executive office. The test set out above for detecting a judicially correctable violation of the separation of powers rule was the assumption by one branch of an essential function of another, especially on a long-term and routine basis, if that assumption of power is both disruptive and unnecessary to the attainment of a legitimate purpose. In applying this test to section 244(c)(2), it is important to specify the precise character of the disapproval mechanism. This character is most clearly and concretely drawn by considering how one might view the impact of the disapproval on the scheme in functional terms. We consider three types of functional impact in turn. First, the disapproval could be viewed as a correction of judicial or executive misapplication of the statute, especially the eligibility criteria. Second, the device could be viewed as a means for sharing the administration of the statute with the Executive on an ongoing basis. Third, it may be argued that the disapproval is the exercise of a residual legislative power to define substantive rights under the law, an exercise falling short of statutory amendment, which would, of course, require the observance of formal constitutional procedures for legislation.

We turn first to view the legislative disapproval as a corrective device. Aliens are clearly entitled to a fair and uniform application of the statutory criteria of which the courts are the ultimate guar-

antor. For this reason, the neutral force of judicial review is a boon even to those aliens who are indirectly benefited by it through the resulting uniformity of the Executive's application of the law. By assuming the task of correcting misapplications of the law, Congress is performing a role ordinarily a judicial or an internal administrative responsibility.

▇ The duty of the Judiciary under this and numerous other statutory schemes is to determine, at the conclusion of administrative proceedings, whether the Executive branch has correctly applied the statute that establishes its authority. *See generally* L. Jaffe, Judicial Control of Administrative Action 320–94, 546–653 (1965). For instance, courts have reviewed orders of deportation and held that a brief visit to another country does not interrupt the statutory minimum period of residency prescribed for suspension of deportation.[30] The effect of section 244(c)(2) is for Congress to reserve to itself the power, by the action of one house, to determine that such a visit does interrupt the residence period. We think the supervening legislative action taken here implies a radical alteration of the role of federal courts in the field of administrative law. By reason of the congressional disapproval device, nearly all judicial interpretations of the criteria in section 244 are rendered, in effect, impermissible advisory opinions.[31] *See Hayburn's Case*, 2 U.S. (2 Dall.) 409, 1 L.Ed. 436 (1792); McGowan, *Congress, Court, and Control of Delegated Power*, 77 Colum.L.Rev. 1119, 1161 (1977). We think this is an interference with a central function of the Judiciary, and that it is an interference which is both disruptive and unnecessary.

The congressional action is disruptive in two senses. Initially, there is a vertical disruption. The nature of the federal system is such that the national government has a direct relation of power over and

---

**30.** *Git Foo Wong v. INS*, 358 F.2d 151 (9th Cir. 1966). *See also Kamheangpatiyooth v. INS*, 597 F.2d 1253 (9th Cir. 1979). For other examples of judicial correction of misinterpretations of the criteria used in determining eligibility, see *Posusta v. United States*, 285 F.2d 533 (2d Cir. 1961) (L. Hand, J.) ("good moral character" in naturalization context); *United States ex rel. Exarchou v. Murff*, 265 F.2d 504 (2d Cir. 1959) ("good moral character" in voluntary departure context); *United States ex rel. Giacolone v. Miller*, 86 F.Supp. 655 (S.D.N.Y.1949) (same).

**31.** *See Hayburn's Case*, 2 U.S. (2 Dall.) 409, 1 L.Ed. 436 (1792); P. Bator, P. Mishkin, D. Shapiro, & H. Wechsler, Hart & Wechsler's The Federal Courts and the Federal System 85–102 (2d ed. 1973). Similarly, if one of the allegations in *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954); *cf. Shaughnessy v. Accardi*, 349 U.S. 280, 75 S.Ct. 746, 99 L.Ed. 1074 (1955) (after remand), had been true, and the alien was in fact denied discretionary relief only because he was on a secret list, one house of Congress could have disapproved any relief an administrative proceeding afforded him on remand by the use of precisely the criterion the Court ruled statutorily impermissible. This would constitute a de facto revision of the Court's statutory interpretation, by only one house.

It appears that the House in this instance did view its action as a correction of a misapplication of the statutory criteria governing eligibility for exercise of the Attorney General's discretion:

> Under that section of law, the Congress is required to review administrative decisions which have recommended the suspension of deportation of aliens who have satisfied the following statutory requirements: First, 7 years of continuous physical presence in the United States; second, good moral character during that time; and third, unusual hardship in the event of their deportation.
>
> It was the feeling of the committee, after reviewing 340 cases, that the aliens contained in the resolution did not meet these statutory requirements, particularly as it relates to hardship; and it is the opinion of the committee that their deportation should not be suspended.
>
> I should emphasize that this is a disapproval resolution and unless it is adopted in this session of Congress permanent residence will be granted to these aliens named in the resolution.

121 Cong.Rec. 40,800 (1975) (Remarks of Rep. Eilberg, explaining House disapproval of suspension for Chadha and five other aliens). If Congress has the power to reserve to itself the ultimate determination of whether extreme hardship is present, decisions such as *Prapavat v. INS*, 638 F.2d 87, (9th Cir. 1980), would be mere advisory opinions.

protection of the persons it governs, *M'Culloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 403–05, 4 L.Ed. 579 (1819), and this is true for each respective branch. Here, the Legislative branch has disrupted or severed the Judiciary's relation to the alien in a substantial way. Aliens are no longer guaranteed the constraints of articulated reasons and stare decisis in the interpretation of the Immigration & Nationality Act. Adjudications they have obtained in the Judicial branch may be set aside for any reason, or no reason at all, so that judicial decisions may be for naught. This effect, the potential nullification of judicial attempts to require uniform application of the statute by the Executive, has an indirect effect upon all aliens who must rely on an administrative application of the statute in the first instance. This vertical impact of the disapproval mechanism diminishes the strength of the Judiciary's structural check on the Executive, which is one of the twin purposes behind the separation of powers principle.[32]

There is a further disruption, horizontal in its impact. On this plane the Legislature interferes with the central or essential function of coordinate branches. The Judiciary's duty to decide cases now becomes subject to review by the Legislature, thus undermining the integrity of the third branch. There are virtually no procedural constraints on the ultimate congressional decision nor any provision for review of Congress' legal or factual conclusions. We are of the view that this departure from the separation of powers norm is not necessary. There is no indication that the Judiciary is incapable of determining whether the Attorney General has abused his discretion or applied a statutory standard improperly. If there were a perceived danger that hearing officers would err by misapplying the statutory criteria in favor of the alien, provision for judicial review of suspensions of deportation would be the ordinary solution. The Legislature thus disrupts the judicial system by retaining a selective power to override individual adjudications, in lieu of changing standards prospectively by the usual, corrective device of a statutory amendment.

The foregoing assumes that the purpose and effect of the legislative intervention is, at least in part, to correct mistaken exercises of executive or judicial power. In response, amici appear to argue that the purpose of the disapproval device is for Congress to share in the administration of the statute. Under this view, Congress, through section 244(c)(2), fills the interstices of statutory criteria and thereby supplements the Executive's implementation of the statute. This addition of more precise statutory criteria on an accretive, case–by–case basis [33] is, in short, law enforcement.[34]

---

**32.** We do not believe there is any contradiction between our judgment that a final determination of the correctness of an application of statutory criteria to an individual case is an essential judicial function, and our observation that the law is initially applied by the Executive. When an administrative agency applies law in a quasi–judicial capacity, it does so under the constraints of due process, such as embodied in the Administrative Procedure Act, and of ultimate review by courts. This emphasizes one danger inherent in departures from the rule of separation of powers: when a governmental power is exercised by a branch other than that ordinarily responsible, the specific guarantees of governmental regularity applicable to the ordinarily responsible branch are in effect short–circuited.

**33.** We would be reluctant to view the statutory criteria of section 244 as so broad and indefinite as to permit constant legislative redefinition that at the same time does not amount to an effective amendment, for such a view would raise serious delegation problems. *See National Cable Television Ass'n v. United States*, 415 U.S. 336, 340–43, 94 S.Ct. 1146, 1148–50, 39 L.Ed.2d 370 (1974); *Amalgamated Meat Cutters v. Connally*, 337 F.Supp. 737, 744–63 (D.D. C.1971) (three judge court) (Leventhal, J.); J. Mashaw & R. Merrill, Introduction to the American Public Law System 223–24 (1975). *Cf.* Frankfurter & Landis, *supra* note 20, at 1013 n. 11 (suggesting delegation doctrine "jejune abstraction"); Gewirtz, *The Courts, Congress, and Executive Policy–Making: Notes on Three Doctrines*, 40 Law & Contemp. Prob. 46, 49–65 (Summer 1976) (suggesting renewed role for delegation doctrine to solve practical and constitutional difficulties); McGowan, *supra* note 10, at 1127–30 (same).

**34.** *Cf. Buckley v. Valeo*, 424 U.S. 1, 285, 96 S.Ct. 612, 757, 46 L.Ed.2d 659 (1976) (per cu-

See generally J. Dickinson, Administrative Justice and the Supremacy of Law in the United States 3–31 (1927). In the circumstances of this case, however, such involvement trespasses upon central functions of the Executive.

■ We turn first to the horizontal disruption caused by one branch assuming the power of another. The Executive evolves its skills and expertise from the administration of a statute over time. This process can be thwarted if legislative interference, constant in its potentiality, can be exercised in any given case without a change in the general standards the legislature has initially decreed. The integrity of the Executive's processes is preserved if stability exists in the steps it takes to effect a legislative policy. Here, there is interference with essential executive functions because the Executive's decision that the House reversed was reached after the Executive had given consideration to an individual case. There was first a quasi–judicial hearing, followed by a review in which the Attorney General was required to exercise a legal discretion. The discretion retained by the political branches was necessarily broad in the case because of the subject matter, the status of aliens; but in the hands of the Executive it was exercisable only in relation to the rights of a particular person under a legal standard subject to judicial interpretation and control for abuse. The Executive's decision, therefore, was a reasoned one, rendered under the law. As such, it was an action that carried all of the weight and dignity that necessarily attends deliberative decisions by one of the highest officers in the Executive branch. Summary reversal of the Executive's decision by the Legisla-

ture in a single case, without an indication of a need to change the standards or general rules to be applied, detracts from the authority of the second branch, and to that extent undermines its powers. Inasmuch as the legislative interference was not an attempt to alter future conduct of the Executive or to change its instructions, and because no principled basis was articulated for the decision from which the Executive could determine with specificity the manner in which it erred, the legislative action was both disruptive of and unnecessary to the sound administration of the law. The horizontal interference with the executive power is egregious in this case, undercutting the second purpose of the separation of powers doctrine, which is to insure efficient administration by the unambiguous assignment of responsibility to specific branches.

The vertical aspects of the interference with the powers of the Executive branch are secondary, but nonetheless significant from a constitutional standpoint. By its action, the Legislature interfered with a relation between the second branch and persons governed by its decisions. The Legislature overrode an administrative process that, gradually, has developed procedural protection for aliens, and one which is characterized by the general, if flexible, requirement of administrative stare decisis.[35] This represents yet another frustration of the checking purpose of the separation principle.

We are of the view that this departure from the separation of powers norm is not necessary. Although the practicality of alternatives to legislative disapproval in other

riam) (White, J., concurring and dissenting) (greater concern for legislative disapproval affecting law enforcement and adjudication); *Clark v. Valeo*, 559 F.2d 642, 659, 664 & n. 13 (D.C.Cir.) (per-curiam) (en banc) (Leventhal, J., concurring) (similar distinction between different administrative functions controlled by legislative veto), *aff'd mem. sub nom. Clark v. Kimmitt*, 431 U.S. 950, 97 S.Ct. 2667, 53 L.Ed.2d 267 (1977).

**35.** For examples of the conscientious partnership between the INS, the Attorney General

and the courts to develop procedural protections for aliens, *see Wong Wing Hang*, 360 F.2d at 719; L. Jaffe, Judicial Control of Administrative Action 72–73, 77 (1965); Gordon, *Due Process of Law in Immigration Proceedings*, 50 A.B.A.J. 34 (1964); Wildes, *The Nonpriority Program of the Immigration and Naturalization Service Goes Public: The Litigative Use of the Freedom of Information Act*, 14 San Diego L.Rev. 42, 63–66 (1976); discussion in Part B, *supra*.

situations raises difficult questions,[36] we are not here faced with a situation in which the unforeseeability of future circumstances [37] or the broad scope and complexity of the subject matter of an agency's rulemaking authority [38] preclude the articulation of specific criteria in the governing statute itself. Such factors might present considerations different from those we find here, both as to the question of separation of powers and the legitimacy of the unicameral device.

We come finally to the third possible characterization of the disapproval's impact on the operation of the statute. Prominent in this case, as it was presented on appeal, were the contentions of the parties as to whether the action by the House was invalid by reason of its unicameral character. We have concluded that the essence of the violation here was the violation of the separation of powers rule, for the reasons stated above. Perhaps it will be objected that Congress has enacted a mechanism reserving to itself the right to deny discretionary relief from deportation under a separate set of standards, operating as it were as an alternate and supplementary procedure, consisting of the one–house disapproval mechanism. In effect the argument would characterize the legislative disapproval as a separate and essentially legislative procedure operating only after executive and judicial procedures have been completed.[39]

The foundation of this argument is the great power allocated to Congress by article I of the Constitution:

The Congress shall have Power ... To regulate Commerce with foreign Nations, ... [and] To establish an uniform Rule of Naturalization, ... [and] To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers ....

U.S.Const., art. I, § 8, cls. 1, 3, 4, 18. *See also Kleindienst v. Mandel,* 408 U.S. 753, 765–70, 92 S.Ct. 2576, 2582–85, 33 L.Ed.2d 683 (1972). We note that this authorizes Congress to "make all laws," not to exercise power in any way it deems convenient. That a power is clearly committed to Congress does not sustain an unconstitutional form in the exercise of the power.

Having vested all legislative power in the Congress, the framers deemed it necessary not only to design checks on that power by means of the other branches, but also to use the internal check of bicameralism. The legislative authority was seen by the framers as the most extensive and, therefore, the one most open to abuse. *See, e. g.,* 2 M. Farrand, The Records of the Federal Convention of 1787, at 25–27; 449–53 (1911). This proposition was stressed repeatedly by the authors of the Federalist Papers. The Federalist Nos. 47 (J. Madison); 48 (same); 49 (same); 51 (same); 62 (same); 71 (A. Hamilton); 73 (same). Alexander Hamilton warned of "the tendency of the legislative authority to absorb every other." The Federalist No. 71 (A. Hamilton) at 483 (J. Cooke ed. 1961). As James Madison wrote:

---

**36.** *See, e. g.,* Cutler & Johnson, *Regulation and the Political Process,* 84 Yale L.J. 1395, 1414–18 (1975); Friendly, *The Gap in Lawmaking–Judges Who Can't and Legislators Who Won't,* 63 Colum.L.Rev. 787, 801–07 (1963); Larsen, *Legislative Delegation and Oversight: A Promising Approach from Oregon,* 14 Willamette L.J. 1 (1977); Miller & Knapp, *The Congressional Veto: Preserving the Constitutional Framework,* 52 Ind.L.J. 367, 394 (1977) (suggesting limitations on operation of legislative veto that may mitigate constitutional problems).

**37.** *See, e. g.,* Nuclear Non–Proliferation Act § 308, 42 U.S.C. § 2159 (Supp. II 1978).

**38.** *See, e. g.,* Federal Trade Commission Act § 5, 15 U.S.C. § 45 (1976). *See also* TAN

33 35 *supra* (disapproval device as mechanism to share administration with Executive).

**39.** The effort precisely to characterize a disapproval mechanism in terms of legislative action has produced various analyses, some quite complex. *See, e. g., Atkins v. United States,* 556 F.2d 1028, 1063–64 (Ct.Cl.1977) (per curiam) (en banc) (plurality opinion), *cert. denied,* 434 U.S. 1009, 98 S.Ct. 718, 54 L.Ed.2d 751 (1978); *id.* at 1093–94 (Kashiwa, J., concurring in part and dissenting in part); *Clark v. Valeo,* 559 F.2d 642, 678–90 (D.C.Cir.) (en banc) (Mackinnon, J., dissenting), *aff'd mem. sub. nom. Clark v. Kimmitt,* 431 U.S. 950, 97 S.Ct. 2667, 53 L.Ed.2d 267 (1977).

In republican government the legislative authority, necessarily, predominates. The remedy for this inconveniency is, to divide the legislature into different branches; and to render them by different modes of election, and different principles of action, as little connected with each other, as the nature of their common functions, and their common dependence on the society, will admit. It may even be necessary to guard against dangerous encroachments by still further precautions.

The Federalist No. 51 (J. Madison) at 350 (J. Cooke ed. 1961).

The principal structural utilities of bicameralism are to restrain the legislative power, to operate to correct its abuse, and to contribute to the integrity of its exercise. 3 M. Farrand, *supra*, at 110 (remarks of Charles Pinckney); The Federalist No. 62 (J. Madison); 1 J. Story, Commentaries on the Constitution of the United States § 554, at 413 (5th ed. M. Bigelow 1891). *See Buckley v. Valeo*, 424 U.S. 1, 129, 96 S.Ct. 612, 687, 46 L.Ed.2d 659 (1976) (per curiam); Watson, *Congress Steps Out: A Look at Congressional Control of the Executive*, 63 Calif.L.Rev. 983, 1030–32 (1975).

From a reading of the Federalist Papers as a whole, the point emerges with singular clarity that bicameralism was deemed to be one of the most fundamental of the checks on governmental power. The critical function of bicameralism as a restraint on power was explained in the Federalist Papers explicitly, early, and at length. It was one of the principal arguments used, particularly by Madison, to convince the people that the

federal government would operate responsibly.

■ There are three reasons why we do not believe that Congress' article I power over aliens may be relied on to sustain the disapproval of Chadha's suspension of deportation by the statutory mechanism here in question. First, the legitimacy of a particular exercise of this power cannot be decided in the abstract. The disapproval here in question generally follows an elaborate series of administrative proceedings. The proposition that one house of Congress has the power to withhold discretionary relief from all deportable aliens in all cases under another regime, such as that of private bills, in which Congress assumes full administrative responsibility, does not establish that that power may also be exercised after the Executive or Judiciary have already exercised their delegated responsibilities. Plenary power for making laws does not import authority to revise particular administrative dispositions. This is a case in which the greater power definitely does not include the lesser, because the exercise of the lesser power here entails the unnecessary disruption of the operation of the other two branches as we have outlined it above.[40]

■ Second, amici's characterization requires us to acknowledge that the power to "make all laws" has important formal and procedural limitations. It is most significant that both houses of Congress must concur in the enactment of positive law that alters individuals' substantive rights. U.S.Const., art. I, § 7. To adopt either

---

**40.** Cf. Rehnquist, *Committee Veto: Fifty Years of Sparring Between the Executive and Legislature* 9–10 (Speech Before the Section of Admin. Law of the Am. Bar Ass'n, Aug. 12, 1969):

[W]hen a statute requiring Executive action has emerged from the legislative process, Article II charges the President and his agents with the faithful execution of that statute. It would clearly be a violation of the separation of powers doctrine for the Executive Branch to be required to share its responsibility for that execution with Congress.

If the "committee veto" clause were regarded as constitutional, it would be possible for Congress to have the power to approve or disapprove any act that the Executive Branch took in executing a statute. For example, Congress could add to the criminal, civil rights, and antitrust statutes, as well as all other statutes administered by the Department of Justice, a proviso which would require the Department of Justice to secure the approval of the House and Senate Judiciary Committees before filing any legal action. While it is improbable that Congress would ever attempt this degree of legislative oversight, it would have the constitutional power to enact such a statute if the "committee veto" clause was regarded as constitutional.

Chadha's or amici's description of the section 244 legislative review process precludes our finding compliance with these procedural requirements. The law in question is indisputably the right of an alien: his entitlement to relief from deportation. If we accept Chadha's view that his status before the legislative disapproval is nondeportation, then obviously that status cannot be changed by one house. Amici appear to concede that conclusion but to deny the premise. They argue that the status quo before congressional review is the alien's deportation, until both houses fail to object during the relevant time ·period. In this respect, amici would analogize the effect of the one–house disapproval to the failure of one house to vote affirmatively on a private bill before it. Although we reject this analogy, we note that it does not necessarily carry the one–house disapproval to a safe harbor of constitutionality in any event. *See* Note, *Private Bills in Congress*, 79 Harv.L.Rev. 1684, 1684–88 & n. 2 (1966). Under this view, it is the nonobjection of both houses which changes the law. Here, also, there is an insurmountable formal constitutional problem. The article I authorization to make law does not permit positive law which alters the substantive legal rights of individuals to be enacted by a mere executive recommendation, which is not a final exercise of specifically delegated power to alter these legal rights, followed by legislative inaction–an inaction that

could equally imply endorsement, acquiescence, passivity, indecision, or indifference. Amici have offered us no reasoning by which we might distinguish their view of the total section 244 process from a regime under which any presidential proposal on a given subject would become part of the United States Code if no house of Congress objected within, say, sixty days.[41]

We consider these two formal difficulties with amici's characterization of the disapproval mechanism decisive. For this reason we need only note that the third difficulty, the potential for unfair or discriminatory use of lawmaking directed at named individuals, presents troublesome issues which we need not reach.[42]

## CONCLUSION

Congress holds all legislative powers. We do not think that body would confess itself unable to formulate deportation rules or policies applicable to individual cases that are sufficiently clear for compliance by the Executive and for ascertainment by the Judiciary. We cannot accept that definite, uniform, and sensible criteria governing the conferral of government burdens and benefits on individuals should be replaced by a species of nonlegislation, wherein the Executive branch becomes a sort of referee in making an initial determination which has no independent force or validity, even after review and approval by the Judiciary, save ·

**41.** *See* Fleishman & Borosage, *Law and Orders: The Problem of Presidential Legislation*, 40 Law & Contemp.Prob. 1 (Summer 1976); McGowan, *supra* note 10, at 1141 n. 93, 1159 n. 176. *Compare Atkins*, 556 F.2d at 1062–63 (accepting argument that unicameral legislative action permitted when "status quo" not altered) *with id.* at 1080 (Skelton, J., dissenting) (mere recommendations cannot become law by legislative inaction). We note that the legislative inaction here raises a problem different from that presented in *Sibbach v. Wilson & Co.*, 312 U.S. 1, 61 S.Ct. 422, 85 L.Ed. 479 (1941), in which the rules that became effective absent passage of a statute to the contrary were internal procedural regulations that were explicitly defined to exclude any effect on an individual's substantive rights. We also note that this legislation by acquiescence objection is not applicable to the review provision in § 244(c)(3) which requires the approval of both

houses of Congress for the granting of discretionary relief.

**42.** Generic consideration of this disapproval as an exercise of legislative power, given the potential for discriminatory treatment of individual aliens, coupled with the drastic nature of the sanction, would raise serious bill of attainder and equal protection problems. *See United States v. Brown*, 381 U.S. 437, 85 S.Ct. 1707, 14 L.Ed.2d 484 (1965); *United States v. Lovett*, 328 U.S. 303, 66 S.Ct. 1073, 90 L.Ed. 1252 (1946). *But see Flemming v. Nestor*, 363 U.S. 603, 612–21, 80 S.Ct. 1367, 1378, 4 L.Ed.2d 1435 (1960) (termination of alien's social security benefits not bill of attainder); *Marcello v. Bonds*, 349 U.S. 302, 314, 75 S.Ct. 757, 764, 99 L.Ed. 1107 (1955) (ex post facto clause not applicable to deportation sanction). *See* 634 F.2d pp. 434–435 *supra*.

# 436

and except for the exercise of final control by the unfettered discretion of Congress as to each case. The defects of this procedure are aggravated by the unicameral aspect of the statutory mechanism and the deficiencies of that procedure preclude justifying congressional action as a separate and independent way of adjudicating the status of aliens outside the executive and judicial processes. In such a world, the Executive's duty of faithful execution of the laws becomes meaningless, as the law to be executed in a given case remains tentative until after action by the Executive has ceased. The role of judicial review in determining the procedural or substantive fairness of administrative action becomes equally nugatory because ex parte influence on administrative decisionmakers, once condemned,[43] now is made the norm. Such flexibility is but the structural twin of lawless rule.

Having so held, we underscore that no malevolent design or purpose can be discerned in the congressional scheme. The statute was enacted for the most humanitarian of considerations. Questions of constitutional power, however, necessarily require us to examine enactments from the standpoint of the framers, who were concerned that defects in formal structure be corrected before leading to real or perceived abuses of power at a later date. The case is within our mandatory jurisdiction and it is our duty, after reviewing the statutory provision in this light, to say that it is void.

The decision by the Attorney General to stay deportation is deemed final. The deportation proceedings are deemed cancelled within the meaning of section 244(d) of the Immigration and Nationality Act, and the Attorney General is ordered to cease and desist from taking any steps to deport this alien based upon the resolution enacted by the House of Representatives. It is so ordered.

---

**43.** *See, e. g., Asimakopoulos v. INS*, 445 F.2d 1362 (9th Cir. 1971); McGowan, *supra* note 10, at 1160–61; Comment, *Judicial Limitation of*

*Congressional Influence on Administrative Agencies*, 73 Nw.U.L.Rev. 931 (1978).